CANDIDA H. IANNELLI, Individually and as Preliminary Executrix of VICTOR IANNELLI, Deceased, Respondent-Appellant, v BERTRAM A. POWERS, as President of New York Typographical Union No. 6, et al., Appellants-Respondents, et al., Defendants.

Second Department, February 10, 1986

### APPEARANCES OF COUNSEL

*Newman & Schlau, P. C. (Philip Schlau* and *Abraham S. Altheim* of counsel), for Bertram A. Powers and another, appellant-respondents.

*Bower & Gardner (Jesse J. Graham, II, Laurie A. Kamaiko* and *Howard R. Cohen* of counsel), for Graphic Arts Federal Credit Union, appellant-respondent.

*Nathan Cyperstein (Steve S. Efron* of counsel), for Lawrence S. Levine and others, appellants-respondents.

*William J. Stutman* for respondent-appellant.

### OPINION OF THE COURT

BRACKEN, J.

On these appeals, we are called upon to determine whether a jury verdict, finding the owners of a commercial office building, and a tenant and subtenant therein, liable for the on-premises shooting death of the plaintiff's decedent at the hands of third persons, is, as a matter of law, supported by sufficient evidence. We hold that the trial evidence does not support the imposition of liability upon these defendants and, therefore, we reverse the judgment appealed from and dismiss the action.

The premises located at 817 Broadway in Manhattan is a commercial office building owned by the defendants Lawrence S. Levine, Leonard Frankel and Albert M. Levine, doing business as Industrial Building Co. (owners). The entire seventh and eighth floors of the building were leased to the defendant New York Typographical Union No. 6 (union). The defendant union sublet a portion of the seventh floor to the defendant Graphic Arts Federal Credit Union (credit union), a Federally chartered savings and loan cooperative for members of the union.

The doors to 817 Broadway were unlocked only during the hours that the building remained open to the public, i.e., Monday through Friday between 7:30 or 8:00 A.M. and 6:00

P.M. Customarily, the building superintendent would unlock the front doors at about 7:30 A.M., and he would remain in the building lobby until relieved by an attendant at 11:00 A.M. While in the lobby, the superintendent would answer inquiries and direct visitors to the elevators, but he was never instructed to screen those people entering the building.

Notwithstanding the limited hours during which the building was open to the public, tenants requiring access at other hours were routinely provided with keys by the owners. In fact, the union's lease expressly provided for access to the building and its passenger elevators "24 hours a day, 7 days a week". The owners had supplied a key to the building to Bertram A. Powers, the president of the defendant union, and he had thereafter caused copies of that key to be made and distributed to other union personnel.

Philip Isenberg was the treasurer of the defendant credit union. On March 17, 1976, Isenberg entered the building at about 7:00 A.M. Although the building was still locked at that hour, he had been given a key, with which he gained entrance. Arriving at the seventh floor, Isenberg unlocked and entered the union offices, for which he had also been given a key. Pursuant to an agreement with a security service, the credit union offices could not be entered before 7:30 A.M. Thus, Isenberg remained in the union offices. He immediately deactivated the union office alarm and entered a code advising the security service of an authorized entry.

At approximately 7:15 A.M., two men connected with the union entered the office, followed by several armed men wearing stocking masks. The masked men forced Isenberg to open the credit union office and the safe within that office. Isenberg was then handcuffed and directed to lie on the floor. He heard the robbers leave, and, shortly thereafter, he heard a single gunshot. Minutes later, a guard from the security service arrived in an apparent response to the alarm triggered by the premature opening of the credit union safe.

The plaintiff's decedent, Victor Iannelli, was found in the public lobby on the seventh floor, at the door of the elevator, with a bullet wound to the head. The decedent, an unemployed printer and union member, had been en route to the union offices for his required weekly "shape-up". Tragically, he apparently encountered the robbers as they were fleeing from the credit union, and he was shot just as he disembarked from the elevator. The decedent lapsed into a coma and died four days later.

The robbers had apparently gained access to the building at about 7:00 A.M., when the doors were still locked. An employee of a tenant on the twelfth floor of the building arrived at that hour, and used her key to open the front door. As she entered, a man approached her and asked to be admitted, claiming that he worked on the fourteenth floor. This man had appeared at about the same time on the previous day and had asked to be allowed in at that time as well. On both occasions, the employee acceded to his requests.

In this action to recover damages for the decedent's conscious pain and suffering and wrongful death, the plaintiff alleged that the proximate cause of the injuries was the negligence of the defendant owners, union and credit union. In particular, the plaintiff alleged that the building was located in a high crime area, and that "loiterers, malingerers and other undesirable characters" had frequented the building. This, coupled with the fact that the credit union was a banking institution and an obvious target for theft and robbery, made it reasonably foreseeable that such crimes would be committed. The plaintiff claimed, therefore, that the appellants-respondents breached a duty to provide greater security in and about their building and respective offices, including, *inter alia,* competent guards to monitor the entrances to the building and the common areas and individual offices within, and to prevent unauthorized access thereto, and alarms and other electronic equipment for surveillance and to alert the police and others that a crime was being or had been committed. The plaintiff also claimed that there had been a negligent failure to limit and control the number of building keys being duplicated and distributed, and to warn those possessing keys of the danger of admitting strangers to the building.

In determining whether the evidence adduced at the trial made out a prima facie case of negligence, we must view it in the light most favorable to the plaintiff, and she is entitled to the benefit of all inferences which could reasonably be drawn therefrom *(see, Negri v Stop & Shop,* 65 NY2d 625, 626; *Becker v City of New York,* 106 AD2d 595, 596-597; *see also, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 312, n 1; *Quinlan v Cecchini,* 41 NY2d 686, 687). Moreover, where, as here, the plaintiff seeks to recover damages for wrongful death, she is held to a lesser degree of proof, and, in determining whether she has made out a prima facie case, she is entitled to every favorable inference which can reasonably be drawn from the evidence *(see, Rivenburgh v Viking Boat Co.,* 55 NY2d 850,

851-852; *Noseworthy v City of New York,* 298 NY 76). However, where we determine, in view of the trial evidence, that there is simply no valid line of reasoning or rational basis supporting the jury's verdict, we must conclude, as a matter of law, that the verdict is not supported by sufficient evidence *(see, Cohen v Hallmark Cards,* 45 NY2d 493, 499; *Becker v City of New York, supra,* at pp 596-597). This is such a case.

In order to prove a prima facie case of negligence, a plaintiff must establish: (1) the existence of a duty on the part of the defendant to the plaintiff, (2) a breach of that duty, and (3) injury suffered by the plaintiff as a result of the breach *(Boltax v Joy Day Camp,* 67 NY2d 617; *Solomon v City of New York,* 66 NY2d 1026; *Akins v Glens Falls City School Dist.,* 53 NY2d 325, 333). A person who possesses realty as either an owner or a tenant *(Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 519) is under a duty to exercise reasonable care under the circumstances to maintain the property in a safe condition *(Kush v City of Buffalo,* 59 NY2d 26, 29-30; *Basso v Miller,* 40 NY2d 233, 241). That duty includes an obligation to take minimal precautions to protect members of the public from the reasonably foreseeable criminal acts of third persons *(Nallan v Helmsley-Spear, Inc., supra,* at p 519; *see also, Miller v State of New York,* 62 NY2d 506, 513; *Kush v City of Buffalo, supra,* at p 33).

However, the possessor of realty is not an insurer of the safety of those who enter upon such realty, and, in order to establish the existence of a duty on his part to take minimal protective measures, it must be shown "that he either knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons * * * which is likely to endanger the safety of the visitor' " *(Nallan v Helmsley-Spear, Inc., supra,* at p 519, quoting from Restatement [Second] of Torts § 344 comment *f).* This is so "even where there is an extensive history of criminal conduct on the premises" *(Nallan v Helmsley-Spear, Inc., supra,* at p 519). For example, in *Nallan,* where the plaintiff was shot by an unknown assailant as he was signing a guest register in the unattended lobby of the defendants' Manhattan office building, the plaintiff adduced evidence at trial that there had been 107 reported crimes in the building in the 21-month period immediately preceding the shooting, including at least 10 crimes against persons *(Nallan v Helmsley-Spear, Inc., supra,* at p 519). The court concluded that although there was no proof that any of the prior crimes had occurred in the lobby:

"[A] rational jury could have found from the history of criminal activity in the other parts of the building that a criminal incident in the lobby was a significant, foreseeable possibility. If the jury found that defendants knew or had reason to know of the prior crimes in the building and further found that defendants should have anticipated a risk of harm from criminal activity in the lobby, it properly could have gone on to conclude that defendants failed in their obligation to take reasonable precautionary measures to minimize the risk and make the premises safe for the visiting public" (*Nallan v Helmsley-Spear, Inc., supra,* at p 520). Similarly, in *Miller v State of New York* (62 NY2d 506, *supra*), wherein liability was imposed upon the State in its proprietary capacity as a landlord for failing to maintain locked doors in a State-operated college dormitory in which a resident student had been raped, there had been previous reports of nonresidents loitering in the dormitory, as well as reports from other campus dormitories of an armed robbery, burglaries, trespass and another rape *(Miller v State of New York, supra,* at p 509; *see also, Loeser v Nathan Hale Gardens,* 73 AD2d 187, 189 [evidence of previous criminal acts in unlighted parking lot]; *Sherman v Concourse Realty Corp.,* 47 AD2d 134, 136 [landlord had notice of prior robberies in building]).

In sharp contrast, the record in the case at bar contains little evidence of criminal activity prior to the date of the shooting. The employee of the twelfth floor tenant, who had apparently permitted the robbers to enter the building, testified only that the neighborhood surrounding the building was "a little scary", and that she had smelled marihuana in a nearby park. A retired New York City homicide detective, who had been involved in the investigation of Victor Iannelli's death, testified only that the neighborhood was located between several "bad" areas. In the building itself, just two relatively minor incidents had been reported: a camera had been taken from the union president's desk, and one of the owners had received a complaint from a tenant regarding a missing typewriter.

Under these circumstances, the evidence failed to establish that the appellants-respondents could have reasonably foreseen the robbery and ensuing homicide, so as to give rise to a corresponding duty on their part to adopt security measures *(see, Nallan v Helmsley-Spear, Inc., supra,* at p 519). It simply cannot be said that the appellants-respondents had reason to know or should have known of a probability of criminal

conduct on the part of third persons which was likely to pose a risk of harm to persons lawfully on the premises *(cf. Johnson, v New York City Hous. Auth.,* 114 AD2d 438). The robbery and shooting by third persons in this case were superseding, intervening criminal acts which were not reasonably foreseeable and which severed any possible causal link between the appellants-respondents' conduct and the death of the plaintiff's decedent *(see, Santiago v New York City Hous. Auth.,* 101 AD2d 735, *affd* 63 NY2d 761).

Moreover, assuming, arguendo, that the appellants-respondents should have foreseen the possibility that violent crimes might occur on the premises, the trial evidence does not rationally support the jury's finding that their conduct violated their respective duties to take minimal precautions to protect members of the public from such acts *(Nallan v Helmsley-Spear, Inc., supra,* at p 519; *see also, Miller v State of New York, supra,* at p 513; *Kush v City of Buffalo, supra,* at p 33). The question of what safety precautions may reasonably be required of the possessor of realty is generally a question of fact to be determined by the jury, taking into account such factors as, *inter alia,* the seriousness of the risk, the severity of potential injuries and the cost or burden imposed on the possessor by reason of each such precautionary measure *(Nallan v Helmsley-Spear, Inc., supra,* at p 520, n 8; *see also, Kush v City of Buffalo, supra,* at pp 29-30). In this case, however, the plaintiff failed to adduce testimony from a qualified expert in the field of building security, and the jury was left to speculate regarding the deficiencies in security, if any, at the time of the incident, and what additional safety measures, if any, could reasonably have been undertaken by the appellants-respondents under the circumstances. It cannot be said, on the basis of the trial record, that they breached their duty to take minimal precautions to protect members of the public *(Nallan v Helmsley-Spear, Inc., supra,* at p 519; *see also, Miller v State of New York, supra,* at p 513; *Kush v City of Buffalo, supra,* at p 33).

Having concluded that the plaintiff failed to prove the breach of a duty, it follows that she failed to establish a prima facie case of negligence on the part of any of the appellants-

---

* The plaintiff did call a licensed private investigator (a retired New York City police officer) who had performed some security work. However, based upon an offer of proof, the trial court sustained an objection to the witness' testimony, and we cannot say that the court's ruling constituted an abuse of discretion *(see, Werner v Sun Oil Co.,* 65 NY2d 839).

respondents. Simply put, the plaintiff failed to show that the appellants-respondents' negligence, if any, "was a substantial cause of the events which produced the injury" *(see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315, *supra,* citing *Nallan v Helmsley-Spear, Inc., supra,* at p 520; Restatement [Second] of Torts § 431).

Accordingly, the judgment in the plaintiff's favor must be reversed, and the action dismissed. In view of our determination, the remaining contentions of the parties are academic, and we do not address them.

MANGANO, J. P., THOMPSON and BROWN, JJ., concur.

Judgment of the Supreme Court, Kings County, entered June 7, 1984, reversed, on the law, with one bill of costs payable to appellants-respondents appearing separately and filing separate briefs, and action dismissed.