Eleanor MONAGHAN, individually and as Guardian Ad Litem for William Monaghan, an incompetent, Plaintiffs,

v.

SZS 33 ASSOCIATES, L/P., Defendant.

No. 89 Civ. 4900 (RWS).

United States District Court, S.D. New York.

March 28, 1991.

Levy Phillips & Konigsberg (Alan J. Konigsberg, of counsel), New York City, for plaintiffs.

Bower & Gardner (Deborah Del Sordo, of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Defendant SZS Associates, L.P. ("SZS") has moved pursuant to Rule 56, Fed.R. Civ.P., for summary judgment of the personal injury action brought by plaintiff Eleanor Monaghan as guardian *ad litem* for her husband William Monaghan ("Monaghan" or collectively, the "Monaghans"). Additionally, SZS has also moved pursuant to Rule 26, Fed.R.Civ.P., for a protective order relating to certain discovery requests. For the reasons set forth below, SZS's summary judgment motion is granted, and therefore SZS's Rule 26 motion is no longer properly before this court.

*The Parties*

The Monaghans are New Jersey residents. SZS, a Delaware limited partnership, owns property in the state of New York.

*Prior Proceedings*

The Monaghans filed their complaint in this personal injury action against SZS in August of 1989.

Previously, a similar action by the Monaghans against the Port Authority of the States of New York and New Jersey (the "Port Authority") in New York State Supreme Court arising out of the same set of facts was dismissed for failure to state a cause of action pursuant to CPLR § 3211.

SZS filed its summary judgment motion on November 1, 1989, and on November 27, 1990, its motion for a protective order.

Oral argument was heard on December 7, 1990.

*The Facts*

The Assault

On March 23, 1987, at 7:30 p.m., Monaghan, a 62 year old employee of New York Telephone, entered through certain doors located near the corner of Sixth Avenue and 32nd street, New York, N.Y., (the "Premises"). On his way to the station operated by the Port Authority Trans Hudson Corporation ("PATH") from which he planned to catch a train home to New Jersey, Monaghan entered through the doors into a vestibule or lobby area (the "Vestibule").

In order to reach the PATH station from the entrance of the corner of Sixth Avenue and 32nd street, the public, upon entering the doors leading from the street, had to walk into the Vestibule and then proceed down a stairway ("Stairway 307," originally "Stairway No. 1") to the PATH concourse. Stairway 307 consists of 21 steps leading to a landing. A second set of stairs, Stairway 308, leads from that landing to the PATH concourse level.

On March 23, 1987, after entering the Premises through the doors and proceeding through the Vestibule to Stairway 307, three armed assailants accosted Monaghan, and, in attempting to rob him, shot him in the head. Monaghan fell at approximately the eleventh step of Stairway 307. As a result of this incident, Monaghan suffered profound brain damage.

The 1935 Deed and Agreement

On the day of the assault, SZS was the owner of the Premises, having taken title to the property on December 22, 1986. The building situated on the Premises was the former Gimbel's building, an 11 story commercial structure that had occupied the site since 1909. Gimbel's was out of business at the time of the assault, and no business was being conducted within the Gimbel's building.

SZS purchased the property from Gimbel's subject to certain existing encumbrances and restrictions. Among the encumbrances was a set of easement agreements arising out of the construction of the IND subway line beneath the building by New York City (the "City"). The easements, set forth in a 1935 Deed and Agreement (the "Deed" and the "Agreement", respectively), govern the rights of the several entities with interests in the Premises, its subjacent areas, or the surrounding properties: Gimbel Brothers, Inc. ("Gimbel's") (predecessor of SZS); Broadway and 33rd Street Realty Corporation (the "Realty Corporation") (successor to the Greely Square Realty Company, and lessor of the Premises to Gimbel's); the City of New York (predecessor of the Metropolitan Transit Authority ("MTA")); the Hudson and Manhattan Railroad Company (the "Railroad") (predecessor of the PATH); New York Hotel Statler Co., Inc.; and the Pennsylvania Tunnel and Terminal Co.

Stairway 307 (referred as Stairway No. 1) is the subject of one of the easements contained in the Agreement. Pursuant to a lease of April 23, 1909, Greely Square Realty Company leased the Premises to Gimbel Brothers, New York, predecessor of Gimbel's, reserving, however, to itself the right to grant to the Railroad for certain purposes an easement to the exclusive use and occupancy of any building to be constructed on the Premises. This easement was known as the Railroad approach, Stairway 1 (later Stairway 307).

In 1935, pursuant to the Deed, the Realty Corporation, Gimbel's and the Railroad granted an easement to the City for the use of Stairway 1 for "rapid transit railroad purposes." The Deed also reserved to the Railroad, Gimbel's and the Realty Corporation a joint permanent easement to Stairway No. 1 "jointly with others, for the purpose of ingress, egress and regress to and from the City Station, the Terminal Station, the Premises and the street." Deed at 8.

Article Sixth of the Agreement provides that:

> The Railroad Company agrees ... at its own cost and expense to maintain ... in good condition and repair, and to properly light, that portion of Stairway 1 from the point of connection thereof with the

new concourse of the Railway Company up to the point of connection thereof with the Lobby or Vestibule Entrance within the Gimbel Building at street level on Sixth Avenue, including the landing thereon and entrances from the basement mezzanine thereto ... and to take every reasonable precaution to prevent nuisances, disorders, and breaches of the peace therein so that person using said approaches may pass through ... freely and safely, without annoyance ... or molestation.

Article Seventh of the Agreement provides that:

Gimbels agrees ... at all times thereafter during the period of this Indenture (a) at its own cost and expense to maintain or cause to be maintained in good condition and repair and, during such hours when business shall be conducted within the Gimbel Building, to properly light, clean and care for the Vestibule Entrances or lobbies, within the Gimbel Building, and the entrances thereto on the street level connecting with Stairway[ ] No. 1 ...

A 1940 Supplemental Agreement (the "Supplemental Agreement") amends Article Sixth of the Agreement by adding new subsection (c) which provides that:

Upon the completion of the construction of Stairways Nos. 1 and 3, as aforesaid, the liabilities undertaken by the Railroad Company shall not be deemed to apply to those areas, being Entrances, which extend into the Gimbel Store, and are designated and shown on the drawings Schedules B1 and C1 by cross hatching.

In the years following the execution of the Deed and of the Agreement, the parties reflected their understanding of their responsibilities pursuant to the terms of the Deed and the Agreement. The PATH inspected and maintained Staircase 307 with some regularity, though PATH workers did not perform maintenance on the Vestibule. Maintenance included the inspection of the handrail, paint, and treads on the stairs. The PATH also inspected and maintained the lighting fixtures on Staircase 307. In addition to their regular duties of patrolling the PATH concourse and platform areas, PATH police officers occasionally check the stairs. Gimbel's security forces also "maintained some vigilance" after business hours over the Vestibule and Stairway 307.

At the time of the assault, SZS had taken several measures to guard the security of the former Gimbel's Building, which was then a construction site in anticipation of the opening of the Abraham and Strauss Plaza, a collection of shops anchored by the Abraham and Strauss department store. SZS had retained the Bri–Den Construction Company to seal off all doors and entrances leading into the Gimbel's Building. Bri–Den blocked off the entrance in to the Gimbels store off the Vestibule by constructing a masonry wall within the Gimbel's building. Also, the glass door leading from the street into the Vestibule had been paneled over with plywood.

*Discussion*

## I. *Summary Judgment Standard*

Under Rule 56, a motion for summary judgment shall be granted when the moving party demonstrates as a matter of law that he is entitled to that remedy because there are no genuine issues of material fact present in the action. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). The moving party, however, has the burden of demonstrating the absence of any genuine issue as to all the material facts, and the nonmoving party is entitled to all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980).

In order to prevail in this personal injury action, the Monaghans must show, *inter alia*, that SZS had a duty of care towards Monaghan, based on SZS's ownership of the area where the assault took place and based on the foreseeability by such land owner of criminal assault which caused Monaghan's injuries.

A dispute about any of the facts that relate to either SZS's ownership or towards the foreseeability of the assault therefore requires denial of the summary judgment

motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *motion denied,* 480 U.S. 903, 107 S.Ct. 1343, 94 L.Ed.2d 515 (1987). The factual dispute, however, must be genuine, *i.e.,* such that "a fair minded jury could return a verdict for the plaintiff on the evidence presented." *Id.,* at 257, 106 S.Ct. at 2514–15.

## II. *SZS' Duty*

■■■ Where real property is subject to an easement, the owner of the dominant estate is responsible for maintaining and making repairs on that part of the property subject to the easement. *Cesario v. Chiapparine,* 21 A.D.2d 272, 291, 250 N.Y. S.2d 584 (2d Dept.1964).[1] Moreover, facts relating to the use of the property subject to easement may provide further evidence as to the scope of the easement. *Id.*

■■ In contrast, an owner of the servient estate has no duty to repair an easement as long as the grant creating such an easement is silent. *Elzer v. Nassau County,* 111 A.D.2d 212, 489 N.Y.S.2d 246 (2d Dept.1985), citing *Greenfarb v. RSK Realty Corp.,* 256 N.Y. 130, 175 N.E. 649 (1931), *reh. denied,* 256 N.Y. 678, 177 N.E. 190 (1931). SZS's duty toward Monaghan, therefore, depends on the scope of the easement—the extent to which SZS is the dominant estate owner—as set forth in the documentary evidence and in the evidence of subsequent use submitted by the parties.

### A. Scope of the Easement

■■ As recounted in the factual statement set forth above, in 1935 at the start of the City's construction of its IND subway line, the several parties with interests in the properties surrounding the proposed subway line agreed to grant the City an easement for the purposes of building such subway line. Deed at 8. Gimbel's and the Railroad in the same agreement reserved for themselves certain rights. The Deed and Agreement gave both Gimbel's and the Railroad easements relating to Stairway 1 (now Stairway 307) and the Vestibule.

The Supplemental Agreement as well as evidence of the Railroad's and Gimbel's practices relating to the maintenance of Staircase 307 and the Vestibule establishes a joint use arrangement between Gimbel's and the Railroad in which the Railroad was responsible for maintaining Stairway 307, and Gimbel's was in charge of the Vestibule. In the Agreement, Article Sixth assigns to the Railroad the task of taking "reasonable precautions to prevent nuisances, disorders and breaches of the peace." Moreover, this duty extends "to the point of connection thereof with the Lobby or Vestibule Entrance within the Gimbel Building at street level on Sixth Avenue, including the landing thereon and entrances from the basement mezzanine thereto ..."

Article Seventh does not charge Gimbel's with a similar duty of preventing nuisances and preventing breaches of the peace in Staircase No. 1. Indeed, Article Seventh charges Gimbel's with the task of maintaining only the Vestibule. Moreover, Article Seventh limits this task of maintenance to maintaining the Vestibule "in good condition and repair"; only during business hours must Gimbel's "properly light, clean and care for the Vestibule Entrances or lobbies."

The Supplemental Agreement of 1940 clarifies this division of responsibility be-

---

**1.** The Monaghans read *Cesario* additionally to impose a common law duty of care on the servient estate owner. The duty imposed on the servient estate owner by *Cesario,* is, however, limited to the facts of the case. In *Cesario,* the plaintiff slipped on a patch of ice which had formed as a result of a drainpipe leak from the servient owner's estate. The court remanded for new trial to determine the extent of the servient estate owner's liability based on a special line of cases relating to an owner's duty to prevent damage from water.

"We reach this conclusion because we see no reason not to invoke the rule which renders an abutting owner responsible for damages when, by artificial means, water is diverted to a public sidewalk where it freezes. That rule must be applied to an owner creating the same condition by the same means on an alleyway which is subject to an easement in favor of an abutting owner." *Cesario,* 250 N.Y.S.2d at 590. Therefore, any duty which *Cesario* can be read to impose on a servient owner stems from the special rules relating to water diversion.

tween Gimbel's and the Railroad. By adding a new subsection to Article Sixth of the Agreement, the Supplemental Agreement serves to relieve the Railroad of liabilities by stating that "the liabilities undertaken by the Railroad Company shall not be deemed to apply to those areas, being Entrances, which extend into the Gimbel Store...." The purpose of this amendment was apparently to clarify a possible ambiguity in the clause "to the point of connection thereof with the Lobby or Vestibule Entrance within the Gimbel Building at street level on Sixth Avenue, including the landing thereon and entrances from the basement mezzanine thereto ..."[2]

The evidence from the depositions of the several Port Authority officials presented by SZS comports with this interpretation. As recounted in the statement of facts, a Port Authority maintenance supervisor, an electrician and a police officer have testified that they each maintained or patrolled Stairway 307, but not the Vestibule. To be considered against this evidence is the affidavit of Carmine Orrichio, the former head of security at Gimbel's, which states that Gimbel's security officers "maintained some vigilance" over the Vestibule and Stairway 307.

The Orrichio affidavit, especially when weighed against the depositions of Port Authority officials as well as the Port Authority's acknowledgment in its report of the assault on Monaghan that the incident occurred on Port Authority Property, does not suffice to raise a *genuine* issue of material fact under the *Anderson* standard, where it is unlikely that in regards to the issue of the division of territory between the Railroad and Gimbel's "a fair minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

For the reasons set forth above, the evidence shows, to the exclusion of any genuine issue of material fact, that the scope of the easement as contemplated by the parties is such that SZS is the dominant estate owner only with regard to the Vestibule. Therefore, any duty of care owed by SZS towards Monaghan derives from SZS's position as the owner of the dominant estate with respect to the Vestibule.

### B. Foreseeability of the Assault

The Port Authority Police Report submitted by SZS makes the finding that the Assault occurred on Staircase 307 and not in the Vestibule. The report is based on an interview with Monaghan after the Assault, as well as on a crime scene search that revealed blood, vomit, and a blood-soaked handkerchief on the steps of Staircase 307. The Monaghans adduce no evidence showing that the assault occurred in the Vestibule. The location of the Assault therefore, does not rise to the level of a factual issue sufficient to preclude summary judgment.

Even assuming, however, that the place of the assault is a factual issue, the Monaghans must still, in order to defeat the summary judgment motion, raise a genuine issue of fact as to the foreseeability of the danger of criminal assault in the Vestibule, the area for which SZS was responsible under the terms of the Agreement.

 A property owner has a legal obligation "to take reasonable steps to minimize the *foreseeable* danger to those unwary souls who might venture onto the premises." *Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 518–19, 429 N.Y.S.2d 606, 613, 407 N.E.2d 451, 457 (1980) (emphasis added). A landowner is not, however, an "insurer of a visitor's safety." *Id.* 50 N.Y.2d at 519, 429 N.Y.S.2d at 613, 407 N.E.2d at 457. Even where there is an extensive history of criminal conduct, the

---

**2.** SZS's interpretation of the word "entrances" to mean doorway renders the amendment nothing more than surplusage. If the amendment merely purported to relieve the Railroad of liability only for those incidents occurring in the doorway leading into the Gimbel's building, there would be no purpose in amending the Agreement, as the Agreement clearly contemplated that Gimbel's and not the Railroad, would be liable for any incidents occurring within the Gimbel's Building. Therefore, the dispute over the interpretation of the Supplemental Agreement does not raise an issue of genuine fact.

possessor cannot be held to a duty to take protective measures "unless it is shown that he either knows or has reason to know from past experience that there is a likelihood of conduct on the part of third persons ... which is likely to endanger the safety of a visitor." *Id.*

■ The test of foreseeability is whether a "valid line of reasoning and whether permissible inferences which could possibly lead rational men to a conclusion of negligence on the basis of the evidence ... [i]f no such valid line of reasoning exists, it is proper for a trial court to make legal determinations without resort to the fact-finding function of the jury." *Id.* 50 N.Y.2d at 517, 429 N.Y.S.2d at 612, 407 N.E.2d at 456 (citation omitted). *See also Adiutori v. Rabovsky Academy of Dance,* 149 A.D.2d 637, 540 N.Y.S.2d 457 (2d Dept.1989) (court grants defendant's motion for summary judgment on grounds that assault that occurred on defendant's property not foreseeable where defendant had no notice of prior criminal activity).

■ If the danger is deemed foreseeable, then the determination of the reasonableness of the safety precautions taken by the tort feasor is usually a question of fact for a jury. *Nallan,* at 50 N.Y.2d at 520, n. 8, 429 N.Y.S.2d at 458, n. 8, 407 N.E.2d at 458, n. 8.

In *Nallan,* the plaintiff was shot in the lobby of a building owned by defendant. The Court of Appeals held that where the plaintiff had introduced evidence that the defendant had notice of 107 reported crimes in the building in the 21 months preceding the criminal assault on the plaintiff, such proof was sufficient to establish the element of breach of a duty of care owed to the visitor invitee on the grounds that a danger was foreseeable.

In *Iannelli v. Powers,* 114 A.D.2d 157, 498 N.Y.S.2d 377 (2d Dept.1986), a tenant of a commercial building was shot during an armed robbery. The lobby of the building had a security guard. The incident occurred on an upper floor.

The Appellate Division reversed a jury verdict in plaintiff's favor, finding no rational basis for the jury's finding of foreseeability where the entire criminal history of the building consisted of two prior crimes of thefts, and where the only other evidence relating to the foreseeability of danger in the lobby consisted of testimony from security officers and from a receptionist stating that the neighborhood in which the building was located was a potentially dangerous one and that the park across the street from the building was frequented by drug users.

■ The Monaghans support their argument for a question of fact as to foreseeability with several Port Authority Police reports recording several incidents occurring around the time of the assault on Monaghan. Only one of these incidents, however, a pickpocketing, happened in the Vestibule; the others occurred on Stairway 307. Moreover, the second incident, an attempted robbery, occurred after the date of the assault, and therefore SZS cannot be deemed to have had knowledge of such event. The third incident submitted by the Monaghans as evidence of the foreseeability of the possibility of criminal acts occurring in the Vestibule relates to the apprehension on Stairway 307 of an individual in possession of a crack pipe, five vials of cocaine, and a manila envelope containing marijuana.

In addition, the Monaghans submit the affidavit of Carmine Orrichio, the former director of security of Gimbel's stating that security personnel of Gimbel's "generally understood" Stairway 307 and the surrounding area to be dangerous. Affidavit of Carmine Orrichio at ¶ 4. The Orrichio affidavit does not refer to specific incidents. Moreover, the Orrichio affidavit refers to the state of affairs in the Vestibule when Gimbel's was still the owner and therefore fails to establish no evidence of the conditions existing in the Vestibule at the time of ownership by SZS, nor is Orrichio's understanding attributable to SZS.

The evidence of the foreseeability of assault or other crimes against the person submitted by the Monaghans is similar to that submitted by the plaintiffs in *Iannelli,* in the number of crimes reported in the

building, in the level of crime in the areas surrounding the building, and in the amount of constructive knowledge attributable to the building owners. Therefore, assuming that the location of the assault is a question of fact and that it could have taken place in the Vestibule, the evidence of the conditions in the Vestibule submitted by the Monaghans does not suffice to raise a factual issue as to the foreseeability of the Assault.

### C. Duty of Care Towards Adjoining Premises

Assuming that the assault on Monaghan occurred not in the Vestibule but on Stairway 307 does not change the applicable duty of care required of SZS. If the incident occurred entirely on Stairway 307 then SZS clearly had no duty towards Monaghan, as an examination of the Deed and Agreement has shown that Gimbel's duties were limited to the Vestibule. If the assailants had lain in wait in the Vestibule before attacking Monaghan on the staircase, SZS's duty would be no greater than it would have been had the entire incident occurred in the vestibule.

Moreover, this latest set of facts would fall within the rule of *Pulka v. Edelman,* 40 N.Y.2d 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976). In *Pulka,* a car exiting defendant's garage hit a pedestrian. The accident occurred on a public sidewalk outside defendant's garage. The court held that the garage owner had no duty to control his patrons. In both cases, the accidents occurred on premises adjoining defendant's property. In *Pulka,* the court held that the owner of the garage had no duty to pedestrian where he could not control his patrons. In the instant case under this latest set of circumstances, SZS did not even have a proprietor/patron relationship with the assailants, and so under no circumstances can be deemed able to control them.

*Conclusion*

The above discussion has shown that SZS does not have a duty of care toward Monaghan under any of the circumstances outlined above, where the evidence shows that any duty that SZS may have is limited to the Vestibule area and where the possibility of criminal assault in the Vestibule was not a foreseeable danger under existing case law. Therefore, whether the assault occurred in the Vestibule or on Stairway 307 is not a material issue of fact sufficient to preclude a grant of summary judgment.

For the reasons stated above, SZS's motion for summary judgment is granted. The court need not therefore consider the Rule 26 motion.

It is so ordered.