(dissenting). I respectfully dissent and vote to affirm the Appellate Division order dismissing plaintiff’s case. *296 The ultimate effect of the Court’s ruling will be to render the defendant, New York City Housing Authority, an unlimited insurer of the safety of its premises against urban crime. The legal, fiscal and policy consequences of such a rule, which imposes a sweeping negligence liability burden of impossible practical and functional dimensions, are unwarranted.
A landlord is generally not responsible for guaranteeing the safety of tenants against the criminal acts of third parties. However, where a private, commercial landlord has sufficient notice of relevant criminal activities bearing temporally and proximately on injuries to a plaintiff, this Court has recognized a narrow duty based on a traditional foreseeability nexus. The duty requires the landowner to take reasonable precautionary measures to protect against or minimize the foreseeable risk, or suffer exposure to a jury resolution for its negligence (Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 520).
However, this Court has demarcated the limits of this duty by requiring that the record must establish that an owner "knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons * * * which is likely to endanger the safety of [a tenant or] visitor’ ” (id., at 519). Questions necessarily evolve as to what quantum and particularity of related past criminal activities must be advanced to entitle an injured party to a jury consideration of this otherwise expansive and largely uncontrollable absorption of liability for the actions of third parties. For example, must not the foreseeable wrongdoing be shown to be at least of a similar kind of criminal activity to that for which damages are sought? How frequently must the similar criminal activity have occurred and at what proximate range of location and time?
This case dramatically widens the dimensions of the applicable rule in virtually every component of the formerly limiting details. For practical purposes, the new rule eliminates the boundaries that courts precedentially promulgated in their efforts to impose reasonable and appropriate limits. Under this case, there are no real qualifying components left to the wide-ranging duty. Indeed, the Court fails to provide a discernible test or set of criteria in this regard to guide the lower courts for the trial of this case or future cases (see, majority opn, at 295). They will be at a loss, as I am, to predict the instruction that should be given the jurors for their definitive and reasonable guidance.
*297 Up to now, the Appellate Division had at least started to develop a sensible and workable formulation. Drawing on its efforts, the rule we might have adopted to govern this case is that a landlord’s duty to take reasonable precautionary measures against a risk of particularly foreseeable criminal conduct arises if there is temporally relevant, experiential evidence pointing to the likelihood of similar criminality in or at proximate locations to the premises at issue (see, Jacqueline S. v City of New York, 182 AD2d 514, 515; Iannelli v Powers, 114 AD2d 157, 162; Sherman v Concourse Realty Corp., 47 AD2d 134, 136). Such a rule would be fair and would help to pinpoint some boundaries on an otherwise virtually limitless landlord’s duty set against overwhelming social ills and criminal activities in the urban universe.
It should not be overlooked that in swinging this kind of liability door wide open in this case, the Court is doing so for the first time against a public municipal landlord charged with maintaining numerous multibuilding public housing projects such as this one, which extends over a 27-acre site in Manhattan. In that context, the Appellate Division’s balanced test seems more faithful to the limited rationale of Nallan v Helmsley-Spear, Inc. (50 NY2d 507, supra), the case which inaugurated this kind of liability in New York against commercial owners. The instant case moves light years away from the limited holdings and facts of Nallan and Miller v State of New York (62 NY2d 506).
For example, in Nallan, the plaintiff was shot by an unknown assailant as he was signing a guest registry in the unattended lobby of the defendant’s office building, where there had been 107 reported crimes in the 21-month period immediately preceding the shooting. On that record, this Court carefully circumscribed that "a rational jury could have found from the history of criminal activity in the other parts of the building that a criminal incident in the lobby was a significant, foreseeable possibility” (Nallan, supra, at 520 [emphasis added]). In diametric contrast, the record in this summary judgment case is barren of any documentation of relevant or similar violent criminal activity in or near the particular public housing building where the crime occurred. We do not know when or where any of the few alleged prior incidents occurred. The testimony of Housing Authority Police Officer Juliet Jackson indicates that in her nine years as an officer at the Wagner Houses, she had responded on five *298 occasions to reports of rape and on 20 occasions to reports of robbery. However, she did not state in which buildings of the vast 22-building Wagner Houses project these crimes had occurred or when they occurred in relation to the criminal act at issue here. She had no recollection of any criminal activity in the particular building at issue. Other than the supposition that rapes "usually occur on the roof or roof landing,” the officer gave no evidence concerning the manner in which the previous crimes were perpetrated, a factor that should be of critical threshold weight in determining whether a duty rooted in foreseeability ought to be imposed here. There is no other evidence of violent crime offered by plaintiff to satisfy the limiting components of the Nallan rule, and I believe on this record and as a matter of policy we should uphold the grant of summary judgment dismissing plaintiff’s case.
Miller v State of New York (62 NY2d 506, supra) is also instructive. The plaintiff satisfied the required threshold showing by offering evidence that with respect to her own dormitory,
"there had been reports to campus security of men being present in the women’s bathroom. Claimant herself had complained twice to the Assistant Quad Manager of her dormitory area about nonresidents loitering in the dormitory lounges and hallways when they were not accompanied by resident students” (Miller, id., at 509).
Furthermore, in Miller, all of the dormitory doors were equipped with locks which the State, as a matter of policy, did not lock. As this Court noted, "the act complained of under the landlord theory of liability was the failure to lock the outer doors of the dormitory” (id., at 513), and the duty which was breached was the "duty to take the rather minimal security measure of keeping the dormitory doors locked” (id., at 514). Here, in contrast, self-locking entrance doors had never been installed on plaintiff’s building or in any of 22 buildings of the sprawling Wagner Houses Project.
Everyone shares the hope and desire that all feasible measures be taken to prevent the type of heinous crime against an innocent youngster that underlies this action. However, creating a cascade of public liability of the type imposed here under these circumstances is particularly ill-suited and ill-fated to redressing endemic urban ills and crimes. This ancient tort theory and common-law method of spreading risk *299 and deterring negligent conduct does not work here. It is more likely in these circumstances instead to divert limited public funds, that might be invested in some safety measures and better public housing, into the payment of escalating tort settlements and judgments against "deep pocket” public landlords. This consequence will flow merely because they were impotent against the tide of criminal activity occurring just about anywhere in their vast premises and anywhere in or near vaster still New York City.
Chief Judge Kaye and Judges Simons, Titone and Smith concur with Judge Hancock, Jr.; Judge Bellacosa dissents and votes to affirm in a separate opinion.
Order reversed, etc.