OPINION OF THE COURT
Francis T. Collins, J.
This is a claim to recover for personal injuries allegedly sustained when claimant was physically attacked while a student at the State University of New York at Albany (SUNYA).
During the spring semester of 1995, claimant resided in a 9th floor suite located in Eastman Tower on the State Quad at SUNYA. Each quad consists of a tower surrounded by low-rise buildings. There are 21 floors in each tower with three suites on each floor. Ordinarily, five students reside in a suite. There is a single entrance to Eastman Tower comprised of four exterior doors and four interior doors. All of the doors have crash bars which permit them to be opened from the inside. SUNYA policy at the time of this incident was to lock the inner doors at 9:00 p.m. each evening as a security measure. Every student residing at State Quad was issued a key which provided 24-hour access to Eastman Tower.
Security for the dormitories at SUNYA was a joint responsibility of the University Police Department and the dormitory supervisors and residence assistants. The University Police Department divided the campus into zones, with each zone consisting of two quads. State Quad and Colonial Quad made up Zone 3. The University Police Department patrolled the campus in three shifts with the night shift for Zone 3 ordinarily consisting of a Campus Public Safety Officer II and two Security Services Assistants. The Public Safety Manual of Rules for SUNYA, received into evidence as exhibit 27, provides in article 20.8 that the law enforcement tasks of a public safety officer are, among others, mobile and foot patrols of the campus, securing the buildings at closing and assisting the residence staff in maintaining security and order in the dormitories. Article 20.9 of exhibit 27 describes the duties of a Security Services Assistant in the following manner:
“Security Services Assistants I (SSA’s) function primarily in a building guard/watchman capacity. They work under the *322 general supervision of the Administrative Supervisor. They are assigned to interior and exterior walking patrol on the Academic Podium and Downtown Campus complex. They may be assigned to other duties at special events under the direct supervision of the Shift Supervisor or a Public Safety Officer.
“1. SSA’s do not have peace officer or police officer powers of arrest. They will not make arrests of citizens under any circumstances. Situations requiring arrest will be referred to a peace officer.
“2. They will perform at least two complete tours of their post during each assigned shift, utilizing watch clock stations where installed.
“3. Patrols will encompass both the interior and exterior of the assigned complex.
“4. SSA’s will be familiar with opening, closing and activity schedules in buildings within his [sic] assigned areas.
“5. During his patrols he will be particularly alert for:
“a. Doors unlocked after scheduled closing.
“b. Activity of an unusual nature (i.e., student group in Chemistry lab after closing).
“c. Evidence of recent vandalism.
“d. Burned out lights.
“e. Other maintenance/safety defects.
“f. Special group activities in his area of assignment.
“g. Criminal activity.
“h. Suspicious persons, particularly juveniles.
“6. All maintenance defects, unlocked doors, and significant activity will be reports [sic] to the dispatcher by radio and in writing by PD-30 report.”
SUNYA Police Lieutenant Prendergast testified that it was the responsibility of the residence staff to lock the doors of the dormitories and the responsibility of the campus police to check that the doors were locked in the course of performing foot patrols around each building in the quad. Lieutenant Prender-gast testified that although the manual stated (art 20.9 [10]) that Security Services Assistants were responsible for locking and unlocking building doors, that obligation only applied to academic buildings and not to residence halls.
Jason LeConey testified that in May of 1995 he was an Assistant Residence Hall Director at SUNYA and the supervisor of Eastman Tower. He resided in a suite on the first floor of Eastman Tower and was assisted by residence assistants lo- *323 coted throughout the building. Residence assistants were charged with the duties of locking the doors of Eastman Tower at 9:00 p.m. each evening, conducting rounds at 11:00 p.m. each evening to make sure that the inner doors were locked, and reporting to Mr. LeConey upon the completion of their rounds. Mr. LeConey testified that during the spring of 1995 there were no complaints concerning Eastman Tower entry door locks, and that if such problems had existed either he or one of the residence assistants would have reported the problem and ensured that it was repaired. Mr. LeConey stated that any person could exit Eastman Tower without a key from the inside by the use of the crash bars.
Eastman Tower was the only dormitory designated for Special Interest Housing on the SUNYA campus during the spring semester of 1995. Special Interest Housing permitted members of a fraternity to reside together in the same dormitory. There were members of six different fraternities residing in Eastman Tower during the spring of 1995. The claimant was a member of the Zeta Beta Tau (ZBT) fraternity, as were most of the students residing on the 9th floor of Eastman Tower. Sigma Chi Epsilon (Sigma) was a fraternity which was not formally recognized by SUNYA and, therefore, was not eligible for Special Interest Housing within Eastman Tower.
Robert Vargas was a ZBT member residing on the 9th floor of Eastman Tower. Chris Sabatino and Joshua Smith were members of Sigma residing at Indian Quad and Kevin Scanlon was a Sigma member residing in Irving Hall in State Quad. In the early morning hours of May 17, 1995, Mr. Vargas was at the Lamp Post Bar when he became involved in an altercation with Mr. Sabatino which resulted in both men being ejected from the bar. Mr. Vargas thereafter traveled to another establishment where he again exchanged words with Mr. Sabatino. Some time later Vargas returned to his suite on the 9th floor of Eastman Tower and placed a telephone call to Mr. Sabatino. Vargas believed that Sabatino used racial slurs, calling him a “Spic”.* The individual on the phone advised Vargas that he and some friends were coming over to the 9th floor. A second telephone call by Mr. Vargas to Mr. Sabatino went unanswered.
Kevin Scanlon had not been involved in the earlier altercation at the Lamp Post but was aware that Mr. Sabatino had been “jumped” by ZBT members. Scanlon, Sabatino and Smith, *324 together with a friend, Jeffrey Crane, decided to go to the 9th floor of Eastman Tower to resolve the situation. As they exited the elevator at the 9th floor Mr. Vargas observed them and summoned six other students from his suite to confront the Sigma members. Mr. Vargas inquired “who called me a Spic?” and a fight immediately broke out.
Claimant testified that on the evening of May 16, 1995 into the early morning hours of May 17 he was in his suite studying for an accounting examination. Some time around 2:00 a.m., he heard shouting outside of his suite causing him to unlock his suite door and enter into the hallway. The next thing he remembered was seeing blood and experiencing pain in the area of his nose. To this day, claimant still does not know who struck him. Claimant testified that he observed ZBT members in the hallway as well as three or four persons that were not ZBT members. He did not know those individuals but learned at the SUNYA disciplinary hearing that they were members of the Sigma Chi Epsilon fraternity.
The University Police were summoned to Eastman Tower and conducted an investigation. Mr. LeConey was also notified and on May 18, 1995 he brought charges pursuant to SUNYA’s judicial processes against Sabatino, Scanlon, Smith, Vargas and the claimant. On October 26, 1995, a hearing upon the charges was conducted by two Hearing Officers appointed by the Judicial Administrator in which claimant, Vargas, Scanlon and Smith took part. The minutes of the hearing, received into evidence as parts of exhibits 29, 30, 31 and 38, provide, in part, that: “Mr. Weitz asked Mr. Smith and Mr. Scanlon how they had gotten into the building and they replied that someone had let them in.”
Smith, Vargas, Scanlon and Sabatino were found guilty of various disciplinary charges, and claimant was found not guilty. On August 14, 1995, claimant served a notice of intention to file a claim upon the Attorney General. The claim was filed on May 16, 1997. The first cause of action in the claim alleges that at approximately 2:30 a.m. on May 17, 1995 claimant was violently beaten and assaulted by individuals who came from outside of his dormitory. The fourteenth paragraph of the first cause of action alleges: “That the Defendants and each of them, their agents servants and/or employees, were negligent in that they failed to properly keep and maintain the dormitory in a safe condition; they permitted an unsafe condition to remain for a long enough period of time to result in injury to Claimant, auri weitz, herein; they allowed a danger- *325 pus condition to exist in said dormitory making it dangerous and unsafe for those persons lawfully residing and/or traversing the said dormitory; they failed to take the necessary precautions to make the unsafe condition safe for residing students and those lawfully upon said premises; they maintained the dormitory improperly and dangerously; they failed to place working locks, barriers, security and/or guards at or near the entrances and exits to said dormitory; failed to properly control the entrance of those not legally allowed in said dormitory; they failed to enforce the rule of the doors of the dormitory being locked at approximately 9:00 p.m. and/or controlling those entering the dormitory after said hours; failed to ensure that each lock of each door of the aforesaid dormitory was working properly and/or had corresponding keys; they allowed windows of said doors to remain cracked; they allowed portions of the windows of the said doors to remain missing; knew or had good reason to know that this condition was dangerous, especially in that it existed in an area constantly used by residing students and others lawfully upon the premises, and yet took no affirmative steps to repair same; knew or had every reason to know that this condition was a particular source of danger and yet took no steps to warn those in the area of said condition or to repair same; and that they further neglected to make necessary repairs allowing the condition to constitute a menace* to life, limb and property of persons upon said premises and that Defendants, and each of them, their agents, servants and/or employees were otherwise negligent in the premises.”
The second cause of action in the claim alleges that as the result of a negligent investigation, SUNYA officials temporarily suspended claimant and subjected him to a judicial hearing at which he was ultimately absolved. It is alleged that claimant suffered mental anguish as a result of the suspension and hearing. At the close of the claimant’s case, defense counsel made a motion to dismiss for failure to establish a prima facie cause of action. Decision was reserved, and that motion will now be addressed.
The law is settled that as “a matter of public policy, there is no cause of action in the State of New York for negligent prosecution or investigation” (Pandolfo v U.A. Cable Sys., 171 AD2d 1013, 1014; Coyne v State of New York, 120 AD2d 769). This rule of law has been applied to administrative disciplinary charges (Treacy v State of New York, 131 Misc 2d 849, affd sub nom. Arteaga v State of New York, 125 AD2d 916, affd 72 NY2d 212; see, McWilliams v New York City Commn. on Hu *326 man Rights, 239 AD2d 105). This court can discern no public policy reason as to why the rule refusing to recognize a cause of action for a negligent investigation should not be extended to administrative disciplinary charges brought against a college or university student. Consequently, the second theory of recovery set forth in the claim fails to state a cause of action. Furthermore, claimant has not presented any evidence that SUNYA officials departed from institutional rules in initiating and conducting the disciplinary hearing (see, Tedeschi v Wagner Coll., 49 NY2d 652 [in which the only relief accorded upon such a showing was the ordering of a new hearing]). Finally, exhibit 14 establishes to the satisfaction of the court that claimant was never, in fact, suspended from the University.
Turning to the first cause of action, in the case of Price v New York City Hous. Auth. (92 NY2d 553, 557-558) Chief Judge Kaye stated the applicable law as follows: “When a public entity acts in a proprietary capacity as a landlord, it is held to the same duty as private landlords in providing security devices in the building (see, Miller v State of New York, 62 NY2d 506, 508). However, it remains immune from negligence claims arising out of governmental functions such as police protection unless a special relationship with a person creates a specific duty to protect, and that person relies on performance of that duty (id., at 510). Plaintiffs do not allege such a special relationship here.”
As in Price (supra), our claimant has not alleged, nor offered any proof of, a special relationship so as to give rise to liability on the part of the defendant for any activity of the University Police. Instead, claimant’s allegations of negligence are aimed at the activity of the defendant in its proprietary capacity as a landlord. In Rios v Jackson Assocs. (259 AD2d 608, 609) that common-law duty is described as follows: “Landlords have a ‘common-law duty to take minimal precautions to protect tenants from foreseeable harm’, including the harm caused by a third party’s criminal conduct on the premises (Jacqueline S. v City of New York, 81 NY2d 288, 293, 294; Nallan v Helmsley-Spear, Inc., 50 NY2d 507). However, to recover damages from a landlord for the criminal conduct of a third party, the tenant must demonstrate that the criminal incident was foreseeable, by showing, for example, that the landlord was on notice of recent crimes in the building (see, Francis v Ocean Vil. Apts., 222 AD2d 551; Iannelli v Powers, 114 AD2d 157, 161-164). In addition, a plaintiff must prove that the landlord’s negligent conduct was a proximate cause of his injury, such as by pre *327 senting evidence that his assailant was an intruder who had gained access to the premises through a negligently-maintained entrance”.
This record is devoid of evidence showing that SUNYA officials had notice of any prior criminal activity upon the premises of Eastman Tower. In this regard, it is important to emphasize that aside from its obligation as a landlord SUNYA had no other duty to protect claimant from assault through its position as the operator of a university as “colleges today in general have no legal duty to shield their students from the dangerous activity of other students” (Eiseman v State of New York, 70 NY2d 175, 190). Thus, the State will not be held liable for a spontaneous attack by one SUNYA student upon another (LePore v State of New York, 72 Misc 2d 448). However, “a student who is injured in a criminal assault in a State-operated college dormitory may recover damages against the State in its capacity as a landlord upon a showing that there was a reasonably foreseeable likelihood of criminal intrusion into the building, that the State negligently failed to keep the outer doors locked, and that the failure was a proximate cause of the injury” (Miller v State of New York, 62 NY2d 506, 508-509). In the case of Burgos v Aqueduct Realty Corp. (92 NY2d 544, 550-551), the Court of Appeals refined the liability of a landlord for criminal attacks upon tenants as follows:
“In premises security cases particularly, the necessary causal link between a landlord’s culpable failure to provide adequate security and a tenant’s injuries resulting from a criminal attack in the building can be established only if the assailant gained access to the premises through a negligently maintained entrance. Since even a fully secured entrance would not keep out another tenant, or someone allowed into the building by another tenant, plaintiff can recover only if the assailant was an intruder. Without such a requirement, landlords would be exposed to liability for virtually all criminal activity in their buildings. By the same token, because victims of criminal assaults often cannot identify their attackers, a blanket rule precluding recovery whenever the attacker remains unidentified would place an impossible burden on tenants. Moreover, such a rule would undermine the deterrent effect of tort law on negligent landlords, diminishing their incentive to provide and maintain the minimally required security for their tenants (see, e.g., Prosser and Keeton, Torts § 4, at 25-26 [5th ed]).
“Clearly, there is a need to balance a tenant’s ability to recover for an injury caused by the landlord’s negligence against *328 a landlord’s ability to avoid liability when its conduct did not cause any injury. There is no need, however, to create a special rule for premises security cases, since the burden regularly placed on plaintiffs to establish proximate cause in negligence cases strikes the desired balance. The rule expressed in Schneider, Humphrey, Wragge, and Gayle fairly balances the competing interests by not automatically foreclosing the plaintiff from recovery in the many cases where the assailant cannot be identified, while still requiring a plaintiff to present evidence from which intruder status may reasonably be inferred. Thus, a plaintiff who sues a landlord for negligent failure to take minimal precautions to protect tenants from harm can satisfy the proximate cause burden at trial even where the assailant remains unidentified, if the evidence renders it more likely or more reasonable than not that the assailant was an intruder who gained access to the premises through a negligently maintained entrance.”
Of course, the claimant has the burden of proving the details of the assault (Zobro v State of New York, 130 AD2d 912), and speculation that there was an intruder will not suffice (Carmen P. v PS & S Realty Corp., 259 AD2d 386). Thus, to recover under the rules set forth in Burgos (supra), the injured party must present competent evidence in admissible form that the assailant was an intruder who entered through an unsecured entrance and not a tenant or someone let in by a tenant (Smith v New York City Hous. Auth., 261 AD2d 390; Cisse v S.F.J. Realty Corp., 256 AD2d 257).
Claimant has attempted to establish an unsecured entrance through various means. Claimant introduced records indicating that at various dates prior to the attack the entrance doors to Eastman Tower required repairs {see, exhibits 15, 16, 17). However, claimant did not submit documentary or testimonial evidence establishing that the entrance doors were in a state of disrepair in the early morning hours of May 17, 1995, and the court credits the testimony of Mr. LeConey that the doors and locks were in proper working order prior to, and on the night of, the attack. Aside from a defective condition, claimant makes the argument that the testimony of Joshua Shaw and Mr. LeConey establishes that on occasions prior to the night of the assault the entrance doors to Eastman Tower were placed in a continuously open position through the use of wooden blocks which were made available by Mr. LeConey. The court does not find Mr. LeConey’s testimony to be as related by claimant’s counsel. Much more importantly, there is no credible evidence *329 in the record that the doors to Eastman Tower were propped open in the early morning hours of May 17, 1995. For that matter, Sigma members Smith, Scanlon, Sabatino and their friend, Jeff Crane, did not need a defective lock or an improperly opened entrance door to gain access to Eastman Tower as the evidence establishes that Scanlon, as a resident of State Quad, had a key to Eastman Tower.
At the disciplinary hearing, claimant specifically asked Smith and Scanlon how they gained entry to the building and they replied that someone had let them in. The minutes of the disciplinary proceeding were offered into evidence by claimant and there was no objection to any hearsay matter contained therein. Claimant now attempts, through his posttrial memorandum of law, to object to the statement as to how Scanlon and Smith gained entry as hearsay. That objection is not availing since “hearsay admitted without objection may be considered in a civil action” (Brooklyn Union Gas Co. v Arrao, 100 AD2d 949, 950), and may be used to prove the facts in controversy (Ford v Snook, 205 App Div 194, 199, affd 240 NY 624).
Based upon the testimony and exhibits received at trial, the court finds that the claimant has failed to establish by a preponderance of the evidence that his injuries were caused by the acts of an intruder who gained access to the Eastman Tower as the result of negligence on the part of SUNYA employees in creating or allowing an unsecured entranceway to exist in the early morning hours of May 17, 1995.
In summary, the court is granting the defendant’s motion to dismiss the second cause of action and that portion of the first cause of action premised upon an alleged breach of police protection for failure to state a cause of action and pursuant to the pleaded defense of immunity. With respect to that portion of the first cause of action premised upon the defendant’s alleged negligence in its proprietary role as a landlord, the court finds that claimant has not established by a preponderance of the evidence that his assailant was an intruder who gained access through the negligence of SUNYA employees. The claim must be dismissed.

 All quotations are from the court’s trial notes.