Hilda ORTIZ, Plaintiff,

v.

NEW YORK CITY HOUSING AUTHORITY, Defendant.

NEW YORK CITY HOUSING AUTHORITY, Third-party plaintiff,

v.

Lamont HENRIQUES, Third-party defendant.

No. 93–CV–4461 (FB).

United States District Court, E.D. New York.

Oct. 19, 1998.

Richard Frank, New York City, for Plaintiff.

Nina Cangiano, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York City, for the Defendant/Third-party Plaintiff.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

On December 26, 1992, plaintiff Hilda Ortiz ("Ortiz"), a 47–year old grandmother, was raped at gunpoint in the stairwell of her building in Brooklyn's low-income Cypress Hills housing project. Her attacker, Lamont Henriques ("Henriques"), was apprehended and pleaded guilty to the crime. Ortiz brought this lawsuit shortly after her attack, claiming, *inter alia*, that the failure of her landlord, defendant New York City Housing Authority ("Housing Authority"), to provide adequate security for her building, including the maintenance of a working lock on the outside door, was a proximate cause of Henriques' attack. Her claim was tried to a jury beginning on April 21, 1998. On April 29, 1998, the jury found that: (1) the Housing Authority failed to maintain the building in a reasonably safe condition; (2) this failure constituted negligence; and (3) the Housing Authority's negligence was a substantial factor in causing Ortiz's injuries. The jury also determined that the Housing Authority acted with reckless disregard for Ortiz's safety, and further determined that the Housing Authority was 60 percent responsible, and Henriques 40 percent responsible, for Ortiz's injuries. The jury awarded Ortiz $2 million as compensatory damages for her past pain and suffering and $1 million as compensatory damages for her future pain and suffering.

Pending before the Court are the following motions by the Housing Authority: (1) a motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure on the ground that Ortiz's proof was insufficient on the issue of proximate cause; (2) a motion for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure on the grounds that the jury's verdict was against the weight of the evidence and seriously erroneous, that the Court committed various errors during the trial, and that the jury's verdict was excessive; and (3) a motion for a stay of execution of the judgment with a waiver of the supersedeas bond required by Rule 62(d) of the Federal Rules of Civil Procedure.

For the reasons that follow, the Housing Authority's motions pursuant to Rules 50(b) and 59(a) are denied in their entirety. However, the Housing Authority's motion for a stay of execution with a waiver of bond, which motion has not been opposed by Ortiz, is granted.

### I. MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of Ortiz's case, the Housing Authority moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, contending that: (1) Ortiz had not met her burden of demonstrating that Henriques was an intruder in the building on the night of the attack, which, under New York law, is an element of proximate cause in negligent security cases; (2) Ortiz had failed to introduce expert testimony on the issue of whether Henriques would have been deterred from attacking Ortiz by the existence of an adequate door lock; and (3) the Housing Authority had satisfied its common law duty to provide a minimal level of security by implementing a tenant patrol. The Court denied the Housing Authority's motion.

At the close of all the evidence, the Housing Authority renewed its Rule 50(a) motion on the same grounds. Counsel also argued, for the first time, that the evidence established that Henriques was a stalker, and that his intentional conduct broke the chain of foreseeability under New York law, thereby absolving the Housing Authority of all liability for Ortiz's injuries. The Court reserved decision on this aspect of the Housing Authority's motion, and decided to send the entire case to the jury. After the jury returned its verdict, the Court denied the Housing Authority's Rule 50(a) motion in its entirety.

On its renewed motion pursuant to Rule 50(b), the Housing Authority now argues: (1) Ortiz failed to prove that Henriques was an

intruder; and (2) Ortiz failed to prove that a functioning lock would have deterred Henriques' attack.

### A. The Applicable Legal Standard for Judgment as a Matter of Law

The same standard applies to a Rule 50(a) motion for judgment as a matter of law and a Rule 50(b) renewed motion for judgment as a matter of law. *See Raspente v. National R.R. Passenger Corp.,* 111 F.3d 239, 241 n. 3 (2d Cir.1997). A motion under either section may be granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [her] favor." *Galdieri–Ambrosini v. National Realty and Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998); *see also Vermont Plastics, Inc. v. Brine, Inc.,* 79 F.3d 272, 277 (2d Cir.1996). The Court will only grant the motion if "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or if the evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53–54 (2d Cir.1993); *see also Galdieri–Ambrosini,* 136 F.3d at 289. The Court "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini,* 136 F.3d at 289 (citing *Vasbinder v. Ambach,* 926 F.2d 1333, 1339–40 (2d Cir.1991)).

A Rule 50(b) motion " 'is limited to those grounds that were specifically raised in the prior [Rule 50(a) motion].' " *Galdieri–Ambrosini,* 136 F.3d at 286 (quoting *McCardle v. Haddad,* 131 F.3d 43, 51 (2d Cir.1997) (other internal quotations omitted)); *see* Fed. R.Civ.P. 50(b); *see also Holmes v. United States,* 85 F.3d 956, 962 (2d Cir.1996); *Lambert,* 10 F.3d at 53–54. Pursuant to this specificity requirement, the Rule 50(a) motion "must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri–Ambrosini,* 136 F.3d at 286. The purpose of the specificity requirement is " 'so that the responding

party may seek to correct any overlooked deficiencies in the proof.' " *Id.* (quoting Fed. R.Civ.P. 50 Advisory Committee Note (1991)). Because the Housing Authority's Rule 50(b) motion relies upon arguments raised in its Rule 50(a) motion, the specificity requirement is satisfied here.

### B. Ortiz's Negligent Security Claim

#### 1. New York Case Law

Under New York law, a landowner has a common law duty "to make the public areas of his property reasonably safe for those who might enter." *Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 519, 407 N.E.2d 451, 458, 429 N.Y.S.2d 606, 613 (1980). "Under this standard, a landlord has a duty to maintain minimal security measures, related to a specific building itself, in the face of foreseeable criminal intrusion upon tenants." *Miller v. State,* 62 N.Y.2d 506, 513, 467 N.E.2d 493, 497, 478 N.Y.S.2d 829, 833 (1984); *see also Jacqueline S. v. City of New York,* 81 N.Y.2d 288, 293–94, 614 N.E.2d 723, 725, 598 N.Y.S.2d 160, 162 (1993). The New York Court of Appeals has noted that "[w]hat safety precautions may reasonably be required of a landowner is almost always a question of fact for the jury." *Nallan,* 50 N.Y.2d at 520 n. 8, 407 N.E.2d at 458, 429 N.Y.S.2d at 614.

It is a tragic sign of the times in which we live that Ortiz's case is by no means unique. Indeed, New York courts have seemingly been inundated with similar negligence actions against the Housing Authority brought by residents of housing projects who have been victims of violent crime premised upon the Housing Authority's alleged failure to maintain working door locks in the projects. In assessing the viability of such claims, the following rule has emerged: "Insofar as [a] plaintiff predicates her claim on a lack of security, based on an allegedly broken entrance door lock, it is incumbent upon her, on the issue of proximate cause, to demonstrate that the assailant was an intruder and not one of the building residents or a guest thereof." *Wright v. New York City Housing Auth.,* 208 A.D.2d 327, 330, 624 N.Y.S.2d 144, 145 (1st Dep't 1995); *see also Woodley v. New York City Housing Auth.,*

245 A.D.2d 502, 666 N.Y.S.2d 485, 486 (2d Dep't 1997); *Melville v. New York City Housing Auth.*, 242 A.D.2d 244, 245, 661 N.Y.S.2d 632, 634 (1st Dep't 1997); *Rivera v. New York City Housing Auth.*, 239 A.D.2d 114, 115, 657 N.Y.S.2d 32, 33 (1st Dep't 1997); *Tolliver v. New York City Housing Auth.*, 238 A.D.2d 187, 188, 655 N.Y.S.2d 534, 535 (1st Dep't 1997); *Folks v. New York City Housing Auth.*, 227 A.D.2d 520, 521, 643 N.Y.S.2d 179, 180 (2d Dep't 1996). Thus, " 'the failure to provide locks on outer doors is only pertinent as an alleged proximate cause if there is evidence to support a finding that the assailant was an intruder ... with no right or privilege to be present there.' " *Tolliver*, 238 A.D.2d at 188, 655 N.Y.S.2d at 535 (quoting *Dawson v. New York City Housing Auth.*, 203 A.D.2d 55, 610 N.Y.S.2d 28 (1st Dep't 1994)) (other internal quotations omitted).

The courts have also held that the plaintiff must provide proof as to how the assailant entered the premises. " '[A]bsent proof of how the perpetrator gained entry to the premises, any negligence claim premised on the theory that the defendant's inadequate security measures permitted the intruder to gain access to the premises necessarily involves speculation on the issue of proximate cause....' " *Tolliver*, 238 A.D.2d at 187–88, 655 N.Y.S.2d at 535 (quoting *Maria S. v. Willow Enters.*, 234 A.D.2d 177, 651 N.Y.S.2d 486, 488 (1st Dep't 1996)); *see also Woodley*, 245 A.D.2d 502, 666 N.Y.S.2d at 486; *Melville*, 242 A.D.2d at 245, 661 N.Y.S.2d at 634; *Rivera*, 239 A.D.2d at 115, 657 N.Y.S.2d at 33.

However, the Court notes that the New York Court of Appeals is currently considering five premises security cases that were resolved in the landlord's favor either on summary judgment or after trial, perhaps signaling a shift in the law that could make it easier for plaintiffs to establish liability. *See Gomez v. New York City Housing Auth.*, —— A.D.2d ——, 672 N.Y.S.2d 676 (1st Dep't 1998), *lv. granted*, —— N.Y.S.2d —— (1998); *Cortes v. New York City Housing Auth.*, 248 A.D.2d 191, 669 N.Y.S.2d 582, *lv. granted*, 92 N.Y.2d 808 (1998); *Hargett v. New York City Housing Auth.*, 244 A.D.2d 459, 664 N.Y.S.2d 348 (2d Dep't 1997), *lv. granted*, 91 N.Y.2d 870, 668 N.Y.S.2d 568, 691 N.E.2d 640 (1998); *Burgos v. Aqueduct Realty Corp.*, 245 A.D.2d 221, 666 N.Y.S.2d 640 (1st Dep't 1997), *lv. granted*, 671 N.Y.S.2d 649 (1st Dep't 1998); *Price v. New York City Housing Auth.*, 244 A.D.2d 186, 664 N.Y.S.2d 9 (1st Dep't 1997), *lv. granted*, 91 N.Y.2d 808, 669 N.Y.S.2d 261, 692 N.E.2d 130 (1998); *see also* Alan Kaminsky, *Causation Issues: Court of Appeals Set to Consider Strict Rules for Liability*, N.Y.L.J., October 14, 1998, at 5.

Finally, the courts have also addressed the situation where there was a previous relationship between the victim and her assailant. In *Tarter v. Schildkraut*, 151 A.D.2d 414, 542 N.Y.S.2d 626 (1st Dep't 1989), the plaintiff's jilted lover followed her into the lobby of her apartment and shot her at point blank range. There was testimony adduced at trial that the outer door of plaintiff's apartment building did not function, that there had been various complaints about the condition of the lock, and that there had been previous instances of burglary and vandalism in the building. However, the Appellate Division determined that the landlord could not be held liable in negligence for the shooting because it was unforeseeable as a matter of law:

> [T]he conclusion is inescapable that plaintiff's ex-lover was intent on harming plaintiff. He had stalked her for that purpose. Given the motivation for the assault, his acts were truly extraordinary and unforeseeable and served to 'break the causal connection' between any negligence on the part of the defendants and the plaintiff's injuries.

*Tarter*, 151 A.D.2d at 416, 542 N.Y.S.2d at 627–28 (quoting *Derdiarian v. Felix Contr. Co.*, 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 169–70 (1980)); *see also Harris v. New York City Housing Auth.*, 211 A.D.2d 616, 617, 621 N.Y.S.2d 105, 106 (2d Dep't 1995) ("The record reveals that Harris was the victim of a targeted murder by a long-time enemy who had tried to kill him on at least one prior occasion. Such an intentional act was an unforeseeable, intervening force which severed the causal nexus be-

tween the alleged negligence of the [Housing Authority] and the complained-of injury.").

### 2. *The Verdict and the Supporting Evidence*

In its charge, the Court instructed the jury that:

> If you find that the Housing Authority was negligent, you must next consider whether the negligence was a substantial factor in causing Ortiz's injury. An act or failure to act is a substantial factor in bringing about an injury if a reasonable person would regard it as a cause of the injury. Now, I further instruct you that Henriques must have been an intruder, rather than one of [the] residents or a guest thereof of Ortiz's apartment building in order for you to determine that the Housing Authority's negligence was a substantial factor in causing Ortiz's injury.

Trial Transcript ("Tr.") at 802. Included among the interrogatories presented to the jury on the Court's special verdict form was the following question: "Question 3. Was the Housing Authority's negligence in not maintaining the premises in a reasonably safe condition a substantial factor in causing Hilda Ortiz's injury?" The jury answered this question in the affirmative, thus implicitly concluding that Ortiz had proven that Henriques was an intruder, and not a guest or visitor in the building. Drawing all reasonable inferences in Ortiz's favor, as the Court must, the record clearly supports this determination.

█ This case is readily distinguishable from most New York negligent security cases because of one critical fact—Ortiz's assailant was apprehended, pleaded guilty to the crime, and gave several statements regarding the attack. Unlike those cases in which the plaintiff's assailant is not apprehended, the jury here heard Henriques' testimony and was read his previous statements. It was consequently not required to speculate regarding the circumstances giving rise to the attack and the manner in which Henriques entered Ortiz's building. Rather, the challenge for this jury was in determining which version of Henriques' testimony to

credit because he changed his story several times.

As the Housing Authority points out, Henriques testified on direct examination that he had entered Ortiz's building on the night of the attack in order to visit his friend Keith. However, Henriques admitted on cross-examination that in a May 22, 1996 deposition he testified that he had come into the building that night to visit his friend Shawn. He conceded, however, that neither Keith nor Shawn had invited him into the building that evening.

But these were not the only reasons for Henriques' presence in the building that were placed before the jury. The jury was also read these other excerpts from Henriques' deposition:

> Q. When you first saw Mrs. Ortiz, she was going into the building?
>
> A. Yes.
>
> Q. Were you the person involved in the assault of Ms. Ortiz?
>
> A. Yes. * * * *
>
> Q. When you first saw her, was she entering the building at 730 Euclid Avenue?
>
> A. Yes.
>
> Q. Were you outside the building on the sidewalk?
>
> A. I was by the next building.
>
> Q. And you followed her over to 730 Euclid Avenue?
>
> A. Yes to 730.
>
> Q. You saw her go into the building; isn't that correct?
>
> A. Yes.
>
> Q. And you waited until they got into the building and then you went into the building after then (sic)?
>
> A. Yes, the doors were broken.
>
> Q. The doors were broken leading into the building at 730 Euclid Avenue, the entrance doors?
>
> A. All of the building doors are broken.
>
> Q. You knew that before that evening?
>
> A. Yes.

Q. How long, to your knowledge, had they been broken before that evening; weeks, months, days?

A. Ever since I've been living out there, the doors always been broken. They fix them one day, they be broken the next. They always stay broken.

Q. So after you saw Ms. Ortiz go into the building, the door closed behind her and you walked in after her because the door was broken.

A. Yes.* * * *

Q. Where do you live?

A. 1220 Sutter Avenue.

Q. Where is 212(sic) Sutter Avenue in relation to 730 Euclid Avenue?

A. That is in the front of the projects.* * * *

Q. You saw her pass you on Sutter Avenue walking toward her house?

A. Yes.

Q. You followed her?

A. Yes.* * * *

Q. When you went up to the front door, to follow her inside the building, the front door was closed?

A. Yes.

Q. But the lock on the front door was broken?

A. Broken, there was nobody.

Q. You followed her into the building and she was assaulted by you in the building?

A. Yes.

Tr. at 684–87.

The jury was also read the following excerpt from Plaintiff's Exhibit 10, a statement given by Henriques on February 15, 1996 to an investigator retained by Ortiz:

I saw Hilda Ortiz walking by herself past my building. She went into her building. I waited until she entered the lobby of her building and when the front door closed I followed her. I went to the front door of the lobby. I knew that the locks on the lobby door were broken and I could just walk into the lobby.

Tr. at 119. The jury was also advised that Henriques had been convicted of rape in 1986, and that he had raped another woman in a different building in the Cyprus Hills project only a month before he assaulted Ortiz.

Henriques thus gave inconsistent versions of the circumstances leading up to the attack. The jury elected to credit his statements that he had been standing outside of his building on the night of the attack, had seen Ortiz pass by and enter her building, and had followed her into the building because he knew that the outside door lock was broken. The Court cannot interfere with the jury's determination in that regard since, as noted above, the Court is required to defer to the jury's "credibility determinations and reasonable inferences ... [and] may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini*, 136 F.3d at 289. Moreover, the jury could properly have inferred from Henriques' commission of other sexual assaults, one in the same housing project only a month before Ortiz's rape, that his purpose in entering the building was to attack Ortiz. In sum, there was an adequate evidentiary basis for the jury's determination that Henriques "was an intruder ... with no right or privilege to be present" in Ortiz's building. *Tolliver*, 238 A.D.2d at 188, 655 N.Y.S.2d at 535 (internal quotations omitted). Accordingly, the Housing Authority is not entitled to a new trial on the ground that Henriques was not an intruder.

The Housing Authority also argues that Ortiz failed to demonstrate that a functioning lock would have prevented the assault. It maintains that Ortiz had an affirmative burden to produce expert testimony that a door lock would have deterred Henriques from entering the premises, noting that Henriques had a long criminal history and "has demonstrated, throughout his life, a certain callousness toward authority." Defendant's Memorandum of Law at pg. 8.

This argument is similarly without merit. The Court does not read either the precedent cited by the Housing Authority in its brief, or *Iannelli v. Powers*, 114 A.D.2d 157, 498 N.Y.S.2d 377 (2d Dep't 1986), cited at trial,

Tr. at 688–701, as imposing an absolute duty upon a plaintiff to produce testimony from a security expert or a criminologist on this issue as part of its burden of demonstrating proximate cause. *Iannelli* is easily distinguishable. *Iannelli* involved a fatal shooting by robbers in an office building. Although the building was kept locked when it was not open to the public, the decedent's assailant was let into the building before office hours by the employee of a tenant who had a key. The plaintiff contended that the landlord breached a duty to provide greater security, including competent guards to monitor building entrances and common areas, and alarms and other surveillance equipment. The court first noted that the robbery and shooting were not foreseeable because there was little prior evidence of criminal activity. *Iannelli,* 114 A.D.2d at 162–63, 498 N.Y.S.2d at 381. The court then stated that, even assuming that the crimes were foreseeable, the trial evidence did not support the jury's finding that the landlord did not satisfy its duty to take minimal safety precautions, citing *Nallan, supra. Iannelli,* 114 A.D.2d at 163, 498 N.Y.S.2d at 381. Under those circumstances, the court held that the plaintiff should have adduced testimony from a qualified expert in the field of building security; absent such testimony, "the jury was left to speculate regarding the deficiencies in security, if any, at the time of the incident, and what additional safety measures, if any, could reasonably have been undertaken by the [landlord] under the circumstances." *Iannelli,* 114 A.D.2d at 163, 498 N.Y.S.2d at 382.

■ Here, by contrast, Ortiz alleged that her attack resulted from the Housing Authority's failure to provide either a working lock on the outside door of her building or any other security device. As will be set forth in greater detail below, there was extensive trial testimony indicating that the housing project, which consisted of 15 buildings housing between approximately 4,500 and 5,000 low-income tenants, was plagued by rampant acts of violence and drug-related crime. The consequences of a failure to maintain reasonable security in such an environment are certainly within the understanding of the average juror and do not require expert testimony. Moreover, Henriques'

own testimony regarding his knowledge that the lock did not work ensured that the jurors would not need to speculate regarding the effect of the unlocked door upon the formation of his criminal intent.

As for the other cases cited by the Housing Authority, it is true that they contain language indicating that the plaintiff must prove that a functioning lock would have prevented the assault. *See Price,* 244 A.D.2d at 186, 664 N.Y.S.2d at 9; *Davis v. Jo–Ern Realty Corp.,* 239 A.D.2d 458, 662 N.Y.S.2d 769 (2d Dep't 1997); *see also Melville,* 242 A.D.2d at 245, 661 N.Y.S.2d at 634 (plaintiff must show that "but for the faulty security devices, the assailant would not have gained entry and committed the crime"); *Harris,* 211 A.D.2d at 617, 621 N.Y.S.2d at 106 ("[T]here is no evidence that the assailant's entry onto the premises was due to the failure of the [Housing Authority] to install or maintain a lock on the front door."). However, the Court reads such language as simply another way of articulating the requirement that the plaintiff prove the manner in which the assailant entered the premises, consistent with the concern that, absent such proof, the jury would be required to speculate on the issue of proximate cause. *See, e.g., Melville,* 242 A.D.2d at 245, 661 N.Y.S.2d at 634. Significantly, none of these cases state or even imply that the plaintiff can only meet this burden through the introduction of expert testimony.

Those portions of Henriques' deposition and trial testimony that were apparently credited by the jury may fairly be read as indicating that Henriques followed Ortiz into the building *because* he knew that the lock was broken. Thus, unlike the cases cited by the Housing Authority, there was testimony before the jury *from the assailant himself* regarding both the manner in which he entered the building and his knowledge that the outside door lock did not function. Accordingly, the Court finds that there was adequate evidence in the record to support the jury's finding of proximate cause, and determines that Ortiz's failure to call an expert on this issue does not require that the verdict be set aside.

■ Finally, the Housing Authority argued at trial that Henriques was a stalker and that the Housing Authority could therefore not be held liable for his conduct, citing *Tarter, supra.* Although the Housing Authority does not press this argument in its renewed motion for judgment as a matter of law, the Court turns to it briefly. As noted above, the Appellate Division has indicated that evidence of a prior adversarial relationship between victim and assailant may sever the causal connection between the plaintiff's injuries and any negligence on the part of the landlord in respect to the implementation of security measures. *See Harris,* 211 A.D.2d at 617, 621 N.Y.S.2d at 106; *Tarter,* 151 A.D.2d at 416, 542 N.Y.S.2d at 627–28. However, the evidence of a prior relationship between Henriques and Ortiz was equivocal at best. Both Ortiz and Henriques testified at trial that they did not know each other before the attack. While Ortiz's goddaughter Kathy Martell ("Martell") testified that Ortiz had spoken to her in Spanish after the attack and told her that Henriques had previously threatened her, Ortiz denied this, stating that Martell "speaks a bad Spanish." Tr. at 370. The jury was certainly entitled to credit the testimony of Ortiz and Henriques to the effect that they had no prior relationship. Accordingly, the Court rejects the Housing Authority's argument that, as a matter of law, Henriques was a stalker and that his intentional conduct broke the foreseeability chain.

Based upon the foregoing, therefore, the Housing Authority's motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure is denied in its entirety.

## II. MOTION FOR A NEW TRIAL

In the alternative to its motion for judgment as a matter of law, the Housing Authority moves for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. Unlike a motion for judgment as a matter of law, there is no preservation requirement for a motion for a new trial. "'A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Atkins v. New York City,* 143 F.3d 100, 102 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir.1997)); *see Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992). "Unlike a [judgment as a matter of law], a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song,* 957 F.2d at 1047. In considering a motion for a new trial, a trial court "'is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner.'" *Id.* (quoting *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978)).

The Housing Authority maintains that it is entitled to a new trial on the following grounds: (1) the jury's conclusion that the Housing Authority's negligence was the proximate cause of Ortiz's injuries is not supported by substantial evidence; (2) the Court erred in failing to include a special interrogatory on the verdict sheet regarding whether Henriques was an intruder; (3) the Court's decision to charge the jury on recklessness was error; (4) the jury's apportionment of liability was irrational; (5) the Court committed certain evidentiary errors and improperly injected itself into the trial; (6) a statement signed by Henriques after the jury's verdict recanting his trial testimony constitutes newly discovered evidence; and (7) the jury's compensatory damage award was excessive. The Court will consider each of these arguments in turn.

### A. The Jury's Finding of Proximate Cause

■ The Housing Authority maintains that substantial evidence in the trial record establishes that Henriques was a guest of one of the residents of Ortiz's building and that he was therefore not an intruder at the time of the attack. This argument is the same argument raised in respect to the Housing Authority's motion for judgment as a matter of law. The Court now analyzes this argument in accordance with the standard applicable to a Rule 59(a) motion for a new trial.

As noted above, Henriques' testimony regarding his purpose for entering the building was equivocal. He testified at trial that he had entered the building to visit a friend, but also gave statements that he had followed Ortiz into the building after seeing her pass and with the knowledge that the outer door lock was broken. Having weighed the evidence before the jury independently, as is permissible on a Rule 59(a) motion, the Court concludes that there was adequate evidence to support the jury's determination that Henriques was an intruder, and that its finding regarding proximate cause was neither seriously erroneous, nor did it result in a miscarriage of justice. *See Lightfoot,* 110 F.3d at 911. Accordingly, the Housing Authority's motion for a new trial on this ground is denied.

### B. The Court's Failure to Include an Interrogatory on the Intruder Issue

The Housing Authority maintains that it was error for the Court not to include on the verdict sheet a special interrogatory as to whether Henriques was an intruder. The Court determined that such an interrogatory would not be appropriate, stating that it did not want to "highlight" the intruder issue on the verdict sheet:

> You have a lot of elements in this case. I included [the intruder issue] as I read the *Wright* [*v. New York City Housing Auth., supra*] case as to proximate cause. I make it clear in the charge and I don't think that [the intruder issue] should be a separate question.... We talk about negligence, we talk about proximate cause, and that's the way I'm doing it.

Tr. at 713–14. As noted above, the Court instructed the jury that unless it found that Henriques was an intruder, and not a guest or visitor, it could not find that the negligence of the Housing Authority was a proximate cause of Ortiz's injuries. The Housing Authority does not contend that the charge in any way misstated the applicable law; rather, its position is that the Court's failure to additionally require the jury to answer a specific interrogatory directed to this issue was error that entitles it to a new trial as a matter of law.

Rule 49(a) of the Federal Rules of Civil Procedure provides that the Court may, *inter alia,* give the jury written questions "susceptible of categorical or other brief answer," or may "use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate." "District courts have broad discretion under Rule 49(a) to formulate special interrogatories for submission to the jury." *Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir.1993). Although "such discretion 'cannot be exercised in a manner [that] withdraws from the jury's consideration a valid theory ... upon which defendant has produced sufficient evidence[,]' [t]he validity of special interrogatories may be assessed by considering them in conjunction with the jury instructions." *Ruggiero v. Krzeminski,* 928 F.2d 558, 561 (2d Cir.1991) (quoting *Cutlass Productions, Inc. v. Bregman,* 682 F.2d 323, 328–29 (2d Cir.1982)); *see also Cann v. Ford Motor Co.,* 658 F.2d 54, 58 (2d Cir.1981) ("The formulation of special verdict questions rests in the discretion of the trial judge, and therefore our review is confined to inquiring whether the trial court's submission of the issues in the form of these questions constituted an abuse of discretion.").

▇▇▇▇ The Court did not abuse its discretion in failing to provide the jury with a separate special interrogatory on the intruder issue. The Court was concerned that a separate interrogatory would unduly emphasize this issue at the expense of other elements of Ortiz's case, including the threshold question of whether the Housing Authority was negligent. The Court, in keeping with New York precedent, instructed the jury that it had to find that Henriques was an intruder before it could find that the Housing Authority's negligence was a substantial factor in causing Ortiz's injury. Thus, far from "withdraw[ing] from the jury's consideration a valid theory ... upon which defendant has produced sufficient evidence[,]" *Ruggiero,* 928 F.2d at 561, the Court's charge fully advised the jury regarding the applicable law in respect to proximate cause. The Court's refusal to additionally provide an interrogatory on this issue was neither error nor a miscar-

riage of justice, and the Housing Authority is not entitled to a new trial on this ground.

### C. Issues Arising under Article 16 of New York's Civil Practice Law and Rules

#### A. C.P.L.R. Article 16—An Overview

■ Section 1601 of New York's Civil Practice Law and Rules ("C.P.L.R.") provides, in pertinent part:

> Notwithstanding any other provision of law, when a verdict or decision in an action or claim for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable ... and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss ....

N.Y.C.P.L.R. § 1601 (McKinney 1997). In premises security cases, a landowner whose actions are found to be negligent may invoke article 16 to seek apportionment of liability against an intentional tortfeasor, provided that the landowner's liability for the plaintiff's injuries is determined to be fifty percent or less. See *Siler v. 146 Montague Assocs.*, 228 A.D.2d 33, 652 N.Y.S.2d 315 (2d Dep't 1997). Section 1602 excepts certain categories of claims and actions from the limitations set forth in § 1601. For present purposes, the only relevant exception is subdivision 7, which provides that § 1601 does not apply to "any person held liable for causing claimant's injury by having acted with reckless disregard for the safety of others."

Article 16 is a backdrop to two separate legal issues raised by the Housing Authority in support of its motion for a new trial. The first issue relates to the Court's instruction regarding the Housing Authority's possible recklessness. Mindful of C.P.L.R. § 1602(7), the Court instructed the jury regarding the meaning of the term "reckless disregard," and additionally included a special interrogatory on the verdict sheet directed to whether the Housing Authority acted with such disregard. The Court did not, of course, indicate the legal import of this instruction and the possible impact of article 16 upon the apportionment of any liability. The jury found that the Housing Authority did indeed act with reckless disregard, thus taking it outside the operation of article 16. The Housing Authority contends that there was no basis in the trial record for a finding of reckless disregard, and that the Court erred in instructing the jury on this issue. Second, the Housing Authority argues that the jury's apportionment of 60 percent of the liability for Ortiz's injuries to the Housing Authority and only 40 percent to Henriques, which also takes the Housing Authority outside the scope of article 16, was irrational. The Court will consider each of these claims in turn.

#### 2. Reckless Disregard

The Court instructed the jury that, in the event that it found that the Housing Authority was negligent and that its negligence was a substantial factor in causing Ortiz's injuries, it would also have to determine whether the Housing Authority's conduct constituted reckless disregard for Ortiz's safety. The Court advised the jury that "[a] landlord acts with reckless disregard for the safety of its tenants when it intentionally or with gross indifference to the rights or safety of its tenants engages in conduct which makes it probable that injury will occur." Tr. at 802–03.

The New York State Court of Appeals has indicated that reckless disregard "requires a showing of more than a momentary judgment lapse." *Saarinen v. Kerr*, 84 N.Y.2d 494, 502, 644 N.E.2d 988, 992, 620 N.Y.S.2d 297, 301 (1994). Rather, "[i]t requires evidence that 'the actor has intentionally done an act of such an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow' and has done so with conscious indifference to the outcome." *Saarinen*, 84 N.Y.2d at 501, 644 N.E.2d at 991, 620 N.Y.S.2d at 300 (quoting Prosser and Keeton, Torts § 34, at 213). The Housing Authority maintains that there was no proof offered at trial that would justify a jury

instruction regarding its recklessness. It contends that, far from demonstrating reckless disregard, the trial evidence demonstrated that the Housing Authority "acted reasonably in addressing the safety concerns of its tenants." Defendant's Memorandum of Law at pg. 15.

Having reviewed the trial transcript, including the testimony of Henriques, Ortiz and other witnesses who were familiar with the Cypress Hills housing project, and guided by *Saarinen*, the Court determines that the record supports a charge on the issue of the Housing Authority's reckless disregard. The evidence is compelling that the Cypress Hills housing project was plagued by violence and drug-related crime, and that residents of the housing project were relegated to abject lawlessness, unsafe in their own homes. In the face of this crime-infested environment, the jury was presented with evidence of the Housing Authority's failure to implement any meaningful security to address the chaotic, life-threatening conditions that the residents confronted daily.

### a. Evidence of Conditions in the Cypress Hills Housing Project

The jury heard extensive and frequently chilling testimony regarding the extent of the crime problem in the housing project. Ortiz testified as follows on direct examination:

Q. During the time that you lived in that building, especially think of the last two years or so before your incident happened, were you aware ... of any criminal activity in that building? * * *

A. I saw holdups.

Q. Where did you see them, in the hallways or—inside the building?

A. No, inside, yes.

Q. Did you see holdups with any kind of a weapon, a knife or a gun?

A. Knife.

Q. And did you see this on one time or more than one time during those three years?

A. A lot of things, a lot of incidents, yes, lots of them.

Q. Did you see anything other than holdups with a knife?

A. What I saw is that after the people would come with the taxis, I saw how ... with the knives ... how they would take things away from them ... how they would remove their shoes also * * * *

Q. Did you see people being beaten up inside the house, in the apartment house?

A. No, in the hallways, I saw it.

Q. In the hallways.

A. And my next door neighbor, they— she got shot in one leg, I remember that.

Q. Were there drugs being used or sold in the hallways and the entranceway of the building?

A. Yes, they did sell, yes.

Q. Was that ... a usual thing, a common thing?

A. A lot, yes, a lot, a lot. They would come in and out, yes.* * *

Q. Were there people hanging around in front of the building at 730 Euclid Avenue during the night times? * * *

A. Yeah, but I didn't pay attention to them.

Q. Where were these people?

A. They would go in and out, in and out.

Q. In and out of the building?

A. They would go in, they would go out. You know where the plants are, that's where they hid the drugs.

Q. And they would come in and out of the building through the front door entrance?

A. Yes.

Q. Was the ... front door entrance locked at any time when this was all going on?

A. Almost never.

Q. That you were able to see, could people come in and out of the build-

ing any time through the front door without using a key?

A. Nobody used any key ... everybody had a key, but nobody used a key. What for? There was no lock.

Tr. at 86–90. Ortiz testified that she complained about the criminal activity to the receptionist in the Cypress Hills office, but that "they didn't do anything." Tr. at 90.

On Ortiz's direct case, two witnesses familiar with Ortiz's building testified about the conditions there. Bobbie Dixson ("Dixson") was an employee of the Housing Authority who had lived in Ortiz's building for twenty years. Dixson testified that she had personally witnessed a shooting in the building, and that she was aware of "shooting" and "knifing" in the building. Tr. at 168–69. She stated that "[w]hen I came home at night, basically I was afraid to walk." Tr. at 171. Dixson testified that she observed drug dealing in the hallways, lobby and staircase of the building, and that knifings and robberies occurred in the building's lobby, hallways, stairways and elevator. She testified that this situation had continued for the past fifteen years, and that life in the building was "very scary." Tr. at 171.

Also testifying was Enovia Bedford ("Bedford"), a legal secretary who occupied Ortiz's apartment before Ortiz moved into the building. Although she no longer lived in the building, she returned frequently to visit friends. Bedford gave the following testimony regarding crime in the building:

THE COURT: Was there crime that was common in the hallways, in the stairways, in the elevators? Do you have any observations that you can ... tell us about?

THE WITNESS: There was a lot of crime. There was shootings, there was drug deals[.]

THE COURT: How commonplace were these types of criminal activities in the corridors, hallways, stairways, elevators?

THE WITNESS: It went on all the time.

THE COURT: Every day, something happening every day?

THE WITNESS: Every single day. Even if we sat on the bench outside in front of the building, we was running in the building because of the shooting * * * *

THE COURT: What was the normal pattern of criminal activity that you observed on a daily basis?

THE WITNESS: Just down the lobby, smoking herb, drinking beers, money passing back and forth, which looked like drug deals.

THE COURT: Drug stuff going down?

THE WITNESS: Yes.

THE COURT: Any acts of violence that were commonplace there?

THE WITNESS: Yes, there was.

THE COURT: Like what, give us a general idea.

THE WITNESS: People would get robbed. They know when the check days would be, and they wait for them in the hallway.

THE COURT: In the hallway?

THE WITNESS: Robbing these people.

THE COURT: You know that?

THE WITNESS: Yes, I do.

Tr. at 191–92. Byron Cave ("Cave"), a Housing Authority witness who was formerly assigned to Cypress Hills as housing manager, confirmed that he was aware that there was a "high level of criminal activity in the Cypress Hills project," Tr. at 565–66, including both crimes against property and physical assaults. Cave stated that it was his impression that the project was a high crime area, which he defined as "[a]n area where there is a perception of a lot of crime ... [and] just an overall sense it is a place where you have to watch your back, so to speak." Tr. at 572–73.

### 2. Evidence Regarding Security in the Cypress Hills Project

Ortiz produced extensive testimony regarding the inefficacy of the security measures implemented by the Housing Authority. For example, the jury was read the

following excerpt from her deposition testimony:

Q. In the approximate one-month period before the assault took place, was there a lock in the front door of the building?

A. They gave me a key to open the door, and there was a lock, but it seems like it was always broken. It was always inoperative.

Tr. at 352–53. Indeed, Ortiz testified that the lock was broken on the date of the attack, which was consistent with her trial testimony that the door "was always open. That door was always open." Tr. at 353. She indicated that she verbally complained about the condition of the door to the receptionist in the main office for Cypress Hills, asking them "please fix the door, fix that lock." Tr. at 91.

Dixson gave a more focused account of the condition of the outer door lock in Ortiz's building, indicating that the lock had been chronically broken for years, and that it had not been repaired for *months* prior to Ortiz's attack:

Q. During the twenty years that you lived at 730 Euclid Avenue, and for the period of time that you lived there, up until this incident happened to Hilda Ortiz on December 25, 1992, were you aware, or did you know of the condition of the front door, specifically with regard to whether or not it locked?

A. It didn't lock.

Q. For how long a period of time before the incident of December 25 had the front door not had a working lock on it?

A. Before? Maybe ten, maybe longer.

Q. Ten years or so?

A. Ten years. * * *

THE COURT: You know that? You have been there for ten years?

A. I've been there for twenty.

Q. Now ... were there periods of time during that ten-year period when they would fix the lock and it would become broken again?

A. Yes.

Q. Do you know specifically for about how long that lock was broken on that front door ... before the incident involving Hilda Ortiz? Was it a matter of weeks, months, days?

A. Months.

Tr. at 166–68.

Bedford corroborated this testimony, explaining that when she visited her friends in the building, up to and including the time of Ortiz's attack in December 1992, she never had to use a key to get in the front door because she never saw a lock. Furthermore, as Henriques himself indicated in his deposition testimony, ever since he had lived in Cypress Hills the door locks had always been broken. There was thus consistent testimony from Henriques, Ortiz, Dixson and Bedford—building residents and visitors who had years of familiarity with the project and with Ortiz's building in particular—that the outside door lock of Ortiz's building was consistently inoperative.

Notwithstanding the evidence that the entrance door lock was perennially inoperative, as well as being inoperative on the date of the attack, the Housing Authority contends that it made good faith efforts to address security problems in Cypress Hills. Donald Matthews ("Matthews"), director of management with the Housing Authority, testified in respect to the implementation of a plan known as "Operation Lockout." Matthews testified that Operation Lockout was a program that was put in place in 1992, with $30 million in funds from the federal government. The purpose of the program was to improve lighting and install and replace locks in all of the Housing Authority's projects in the City. Matthews indicated that before 1992, there had been problems in securing funding to undertake an extensive improvement program in the City's housing projects; however, once Operation Lockout was underway, efforts were made to ensure that there were working locks on all doors, which included the gradual replacement of standard locks with more state of the art electromagnetic locks. Operation Lockout was not imple-

mented all at once; rather, the planned improvements were undertaken in stages.

However, there was evidence that the Housing Authority fell short of meeting the goals of Operation Lockout in Ortiz's building in 1992. Although Wayne Nesbit ("Nesbit"), the superintendent for the Cypress Hills project in 1992, testified that the project's maintenance personnel would regularly inspect elevators and entrance doors and have broken locks repaired in that year, the Housing Authority was unable to produce *any* daily work logs or other records to support this claim. The following questions were posed to Nesbit by Ortiz's counsel and the Court with regard to the absence of any contemporaneous daily records regarding the inspections and repairs that were allegedly made on the outside doors of the buildings in Cypress Hills:

> THE COURT: Is there anything out there that you have in terms of record. kept by the Housing Authority, by you or anybody else in a position of responsibility, that would show us what the condition of the locks or the door of 730 Euclid Avenue was on December 25, 1992, anything out there?
>
> THE WITNESS: As far as I know, no. * * *
>
> THE COURT: Is there anything out there at all? Did they make records?
>
> THE WITNESS: Again, I believe the maintenance men would maybe put it on a piece of paper or something.... I wouldn't see these personally, again. They had a supervisor who they would give this to if they could, if they needed to. If they couldn't correct the problem they would give it to a supervisor. * * *
>
> THE COURT: There's nothing around that you know of today?
>
> THE WITNESS: Nothing that I know of, no. * * *
>
> THE COURT: Is it a policy and practice to keep these pieces of paper

that the maintenance people supposedly gave you or somebody?

> THE WITNESS: At that time there wasn't, no.
>
> THE COURT: There was no policy?
>
> THE WITNESS: No. * * *
>
> Q. What I want to know is whether you have the reports of any of the maintenance men, any of the supervisors, any of the inspectors, or any of the people who inspected those doors— * * *
>
> THE COURT: The answer is no, you don't have those reports?
>
> THE WITNESS: No.

Tr. at 477–81.

There was thus no documentary evidence produced by the Housing Authority that would support its claim that doors in Cypress Hills were inspected and repaired regularly. Indeed, the only inspection reports produced by the Housing Authority were based upon a single inspection of the buildings during a given month, representing a "snapshot" of the doors' condition for that month. Tr. at 468. The reports generated for late 1992 indicated that in October, November and December, the entrance door for Ortiz's building was not locking properly, but there is no indication on the reports regarding the dates of the inspections. There was, therefore, no contemporaneous repair or inspection report, or indeed any documentary evidence whatsoever produced by the Housing Authority, that would contradict: (1) the testimony of Ortiz, Bedford, Dixson and Henriques that the outside door of Ortiz's building was always broken; (2) Ortiz's testimony that the lock on the outside door of her building was not functioning on the date of her attack; or (3) Dixson's specific testimony that the lock had been broken for months before Henriques' attack.

Cave, who was called by the Housing Authority, gave crucial testimony regarding the lack of security in Cypress Hills. Cave testified that the locks that were placed on the doors in 1992 were "standard," "basic" locks. Tr. at 567. When asked how difficult it was to vandalize the outer door locks in the housing projects, Cave replied: "It's a standard

lock, you need a key, people can break doors, break locks, break windows." *Id.* When asked why additional security measures, such as an intercom, were not installed, Cave stated that intercoms "[were] not just something that we can install. It was a big process that you had to go through." Tr. at 568. Furthermore, Cave testified that, despite tenants' requests, security guards were never stationed in the buildings. Rather, just two Housing Authority police officers were assigned to the 15–building project for an eight-hour shift to protect the approximately 4,500 to 5,000 residents. During the rest of the day, the project received no other protection apart from the police protection afforded to the general population of the City of New York ("City") by the City Police Department. When asked why additional security could not be implemented, despite the fact that the project was a high-crime area, Cave simply replied that there was not enough money in the budget.

There was evidence before the jury, therefore, that the Housing Authority: (1) knew that crime was rampant in Cypress Hills; (2) was aware that locks to the entrances of buildings in the project were repeatedly vandalized and, as a practical matter, were totally ineffective; (3) failed to regularly inspect and replace inoperative locks; and (4) for as long as ten years failed to meaningfully address the security problems confronted by the residents of Cypress Hills, and, in particular, Ortiz's building. On this record, the jury could properly have found that the Housing Authority's piecemeal, ineffective response to the scourge of serious crime in Cypress Hills, despite its knowledge of the extent of such crime, constituted an intentional course of conduct "of such an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." *Saarinen*, 84 N.Y.2d at 501, 644 N.E.2d at 991, 620 N.Y.S.2d at 300 (internal quotations omitted). Consequently, the Court did not err in presenting the issue of recklessness to the jury. The Housing Authority's motion for a new trial on this ground is therefore denied.

### 3. *Apportionment of Liability*

The Housing Authority maintains that the jury's apportionment of 60 percent of the liability for Ortiz's injuries to the Housing Authority and 40 percent to Henriques is irrational and requires a new trial on the issue of apportionment. This argument is without merit.

The New York Court of Appeals has held that the inquiry into the proximate cause of an injury depends upon the facts of each individual case, and that "[g]iven the unique nature of the inquiry in each case, it is for the finder of fact to determine legal cause, once the court has been satisfied that a *prima facie* case has been established." *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 169 (1980). "Where ... the evidence supports a finding that [two] parties bear substantial responsibility for the injury, the determination of whose fault played the more critical role in its causation is properly left to the fact finder." *Facci v. General Elec. Co.*, 192 A.D.2d 991, 992, 596 N.Y.S.2d 928, 929 (3rd Dep't 1993).

As noted above, New York permits juries to apportion fault between negligent and intentional tortfeasors. *See Siler, supra.* It is apparently the Housing Authority's position that any verdict that apportions a greater degree of fault to a negligent tortfeasor than an intentional tortfeasor is *per se* irrational. Neither the parties nor the Court have been able to locate any New York authority that deals precisely with this point. However, the Supreme Court of Arizona recently considered a similar factual scenario in the case of *Hutcherson v. City of Phoenix*, —— Ariz. ——, 961 P.2d 449 (Ariz.1998) ("*Hutcherson II*"). In *Hutcherson II*, the plaintiffs' decedents—a woman and her new boyfriend—were shot and killed by the woman's ex-boyfriend. Before the shooting, the woman had placed a call to the 911 operator reporting that the ex-boyfriend had tried to assault her the night before and had threatened to kill her and her family. The 911 operator assigned the call its lowest priority, and 22 minutes later, the ex-boyfriend broke through the front window of the apartment, shooting the woman and her new boyfriend

to death and then fatally shooting himself. The victims' families brought a wrongful death action against the City of Phoenix based upon its mishandling of the 911 call. After trial, the jury apportioned 75 percent liability for the shooting to the City of Phoenix, and only 25 percent to the assailant. The intermediate appellate court, while affirming the liability and damage verdicts, reversed and remanded for a new trial on the apportionment of fault, concluding that "[t]he evidence does not justify a verdict that the 911 operator was three times as much at fault for the wrongful deaths of Plaintiffs' decedents as [the assailant], who intentionally shot and killed Plaintiffs' decedents." *Hutcherson v. City of Phoenix*, 188 Ariz. 183, 187, 933 P.2d 1251, 1255 (Ariz.Ct.App.1996) ("*Hutcherson I*").

The Supreme Court of Arizona, in an *en banc* decision, reversed. The court endorsed the permissibility of comparing negligent and intentional conduct for purposes of apportioning responsibility for tortious conduct, noting that "different types of tortious conduct, ranging from negligent to intentional, are merely points along a fault continuum and should be thought of not as 'different-in-kind,' but rather 'different-in-degree.' " *Hutcherson II*, 961 P.2d at 452 (citing *Blazovic v. Andrich*, 124 N.J. 90, 590 A.2d 222, 231 (N.J.1991); J. Dear & S. Zipperstein, Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations, 24 Santa Clara L.Rev. 1, 5 (1984)). The court noted that "no compelling authority has been cited for the proposition that intentional conduct must be given more weight than negligent conduct in the apportionment of fault." *Hutcherson II*, 961 P.2d at 452–53. Rather, the court found that the jury could properly have determined that while the assailant's moral culpability was greater than that of the City of Phoenix, the City bore greater responsibility for anticipating the occurrence of the crime and yet failing to prevent it. *Id.* at 453. The court quoted from the dissenter in the intermediate appellate court:

> The murderer's culpability is enormous, the [911] operator's is slight. He committed deliberate homicide; she misjudged the severity of the call. And when it comes to contribution to causation, at first

blush, the imbalance again weighs heavily toward the murderer. When you add relative timing into the picture, however, the balance starts to shift. The operator has notice of a potentially imminent harm and a chance to avoid it. This is a proper factor for the fact finder to weigh. It is also proper for the fact finder to weigh the operator's responsibility for foresight and avoidance ... [in the] weighing of relative degrees of fault.

*Hutcherson I*, 188 Ariz. at 197, 933 P.2d at 1265 (Grant, J., dissenting). The court determined that it was the province of the jury to evaluate the relative degrees of fault, and concluded that "because the jurors could have found that an opportunity to avert [the] harm was lost by virtue of the operator's negligence, we will not second-guess their allocation of fault." *Hutcherson II*, 961 P.2d at 454.

A similar result must obtain here. Although Henriques obviously bears enormous responsibility for Ortiz's injuries, the heinous nature of his conduct was only one factor to be weighed by the jury in apportioning fault. The jury could also properly have considered the Housing Authority's notice of the conditions that made such an attack not only foreseeable but probable, and the Housing Authority's failure to take meaningful steps to address the security problems that persisted in the Cypress Hills housing project. Thus, as in *Hutcherson*, the jury could properly have concluded that the Housing Authority bore substantial responsibility for recognizing the conditions that gave rise to Ortiz's injuries and yet failing to take action to alleviate them.

The Housing Authority cites the California case of *Pamela B. v. Hayden*, 31 Cal.Rptr.2d 147 (Cal.Ct.App.1994), in support of its argument that the jury's apportionment of fault was irrational. *Pamela B.* was an action brought against the owner of an apartment house after a tenant was raped in the building's parking garage. However, the Court is not persuaded by this case for a number of reasons. Preliminarily, the Court notes that this case may not be cited because the court's opinion was superseded by the California

Supreme Court and the case remanded to the Court of Appeals. *See* California Rules of Court 976, 977, 979.[1] In any event, *Pamela B.* differs from this case in several significant respects. First, the apportionment of liability in that case was 95 percent liability on the part of the landowner and five percent on the part of the intentional tortfeasors, an apportionment that is obviously much more susceptible to a finding of irrationality than the 60–40 apportionment at issue here. Second, the California Court of Appeals was of the opinion that jurors are not capable of rationally apportioning fault between intentional and negligent tortfeasors, and consequently argued for a wholesale "revamping" of the rules applicable to landowner liability cases. *Id.* at 160 n. 14. By contrast, the Appellate Division in *Siler* expressly endorsed the apportionment of fault between negligent and intentional tortfeasors, and nowhere suggested that an apportionment of greater responsibility to a negligent tortfeasor would be *per se* unreasonable.

To conclude, the Court determines that where, as here, the evidence supports a finding that both Henriques and the Housing Authority were liable for Ortiz's injuries, the apportionment of liability is a jury function. The Court declines to establish a *per se* rule that an apportionment of greater responsibility to a negligent tortfeasor than to an intentional tortfeasor is always irrational. Rather, the jury must consider a number of factors in determining an appropriate allocation of responsibility. Here, there is evidence in the record that could support a finding that but for the conduct of the Housing Authority, Henriques would not have been in a position to attack Ortiz. Accordingly, the Court will not interfere with the jury's allocation of fault. The Housing Authority's motion for a new trial on the issue of apportionment of liability is therefore denied.

### D. Evidentiary and Trial Issues

The Housing Authority also contends that it is entitled to a new trial because of the manner in which the trial was conducted. First, the Housing Authority argues that the

Court made certain erroneous evidentiary errors that deprived it of a fair trial. Second, it claims that Ortiz's counsel made improper, inflammatory comments to the jury. Third, it claims that the Court improperly injected itself into the trial by asking leading questions of witnesses. The Court will consider each of these arguments in turn.

### 1. Evidentiary issues related to Henriques' letters to Ortiz's attorney

■ At trial, the jury was read two letters that Henriques had sent to Richard Frank ("Frank"), Ortiz's attorney. In the first letter, dated December 1, 1996, Henriques asked Frank to send him $30 "if you still need me to help you with the Hilda Ortiz case." Tr. at 150. In the second letter, dated December 16, 1996, Henriques indicated that if Frank did not send him $30, he would "write to the Housing authority and court . . . and tell them something else so Hilda Ortiz won't win her lawsuit. . . . If you can't send me the 30 dollars you won't win that case. If you can't going [sic] to send me the money, let me know so I can start writing to other people about this case." Tr. at 151. Henriques testified that he could not recall Frank's having promised him anything for his testimony, and further stated that Frank had never paid him the $30, and had only asked him to tell the truth. Tr. at 148.

The Housing Authority now claims that the Court erred in failing to permit Frank to be called to the stand to testify regarding the circumstances of his contact with Henriques. The Housing Authority also claims that the Court should have admitted into evidence a January 8, 1997 letter from Frank to the Court in which he advised the Court regarding Henriques' two letters, and additionally stated the following:

> On the date of [Henriques'] deposition, Mr. Henriques' sister Sonia was present. I spoke with her advising her that if Mr. Henriques told the truth at this deposition, Mrs. Ortiz would be willing not to oppose any parole consideration he might be entitled to. I had no private conversations at any time with Mr. Henriques who was

---

1. The Court has no information as to the disposi- tion of this case upon remand.

continuously in the custody of two corrections officers.

Reply Affidavit of Nina Cangiano ("Reply Aff."), at Exh. "O."

It is well established that "[t]he decision of which evidence is admissible is one that is committed to the district judge's discretion," and will be reviewed only for "manifest error." *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1376 (2d Cir.1989); *see also ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 651 (2d Cir.1991). The Housing Authority has not offered any convincing basis for the Court to reconsider these evidentiary rulings. In respect to the Court's decision not to permit Frank to be called, the Court determined that such testimony would have been cumulative and unnecessary since both parties had ample opportunity to explore Henriques' credibility when he was on the stand. The Court similarly discerns no basis for revisiting the issue of the admissibility of the January 8, 1997 letter. To the extent that the Housing Authority maintains that it should have been permitted to inquire into whether Henriques was promised special consideration regarding any future parole applications, Henriques himself testified, in response to questions posed by the Housing Authority, that he thought it would be in his best interest to cooperate with Ortiz to increase his chances of being considered for parole. Furthermore, Henriques specifically testified, as noted above, that Frank had not, to Henriques' recollection, ever promised him anything in return for his testimony. Because the Court concludes that these evidentiary rulings did not deprive the Housing Authority of a fair trial, its motion for a new trial on this basis is denied.

## 2. *Remarks of Ortiz's counsel*

In a footnote in its reply brief, the Housing Authority contends that Frank made improper, inflammatory appeals to prejudice throughout the trial. In support of this argument, the Housing Authority has included an excerpt from Frank's summation in which he argued, *inter alia*, that "[p]oor people really don't count for much in our society." Tr. at 726. Having considered the trial transcript as a whole, including Frank's summation, the Court finds the Housing Authority's argument to be without merit.

It is ordinarily improper for an attorney to appeal to economic or regional distinctions in addressing the jury. *See Pappas v. Middle Earth Condominium Assn.*, 963 F.2d 534, 540–41 (2d Cir.1992); *Koufakis v. Carvel*, 425 F.2d 892, 905 (2d Cir.1970). However, appeals courts traditionally defer to a trial judge's determination as to whether counsel's improper conduct resulted in prejudice. *Pappas*, 963 F.2d at 540. "[N]ot all misconduct of counsel taints a verdict to such a degree as to warrant a new trial. Some misconduct is *de minimis* in the context of the entire trial, and some is promptly dealt with by the trial court's rulings and curative instructions." *Id.*

This case was unquestionably an emotional one, marked by compelling testimony regarding the quality of life in the Cypress Hills housing project. There were frequent objections and often passionate legal argument outside the presence of the jury. However, the Court is convinced, based upon its participation in the trial and its subsequent review of the full trial record, that the Housing Authority's ability to receive a fair trial was not compromised by the conduct of Ortiz's counsel. In respect to the specific objection raised by the Housing Authority during Frank's summation, the Court told the jury at that time to disregard Frank's arguments regarding the Housing Authority's treatment of "poor people" and his efforts to contrast the cost of installing locks with the cost of building a new Yankee Stadium. Tr. at 727. Furthermore, during its charge, the Court advised the jury that the arguments of counsel were not evidence and gave the following specific instruction:

Now, we had vigorous counsel, and I respect that. Sometimes when I have aggressive lawyers it makes me work harder, I have to say: "Stop, take it easy, just contain yourself," and I had to do this. I would rather have lawyers who are zealous advocates for their client than have the opposite. If I have the opposite, I'm not sure that the case is fully presented to the jury. I would rather this type than the

other way, quite frankly, and that is what they're supposed to do.

Tr. at 788–89.

In sum, the Court concludes that the Housing Authority is not entitled to a new trial based upon the conduct of Ortiz's attorney.

### 3. The Court's questioning of witnesses

 Also in a footnote in its reply brief, the Housing Authority maintains that it was prejudiced by the Court's active questioning of certain witnesses. In support of this argument, it annexes a portion of the trial transcript that includes the Court's questioning of Bedford and Dixson about the conditions in the Cypress Hills project. The Housing Authority argues that these questions "affected [the Housing Authority's] substantial right to a fair trial and thus, mandates reversal and remand." Defendant's Reply Memorandum of Law at pg. 6 n. 3.

"[T]he district court judge, in conducting a criminal or civil trial, acts as more than a mere moderator or umpire. His function is to set the tone of the proceedings and exercise sufficient control to insure that the trial will be an orderly one in which the jury will have the evidence clearly presented." *Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1131 (2d Cir.1974) (internal citations omitted). "[T]he trial court may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become an advocate for one side." *United States v. Filani*, 74 F.3d 378, 385 (2d Cir.1996). Thus, "a trial court 'should exercise self-restraint and preserve an atmosphere of impartiality and detachment,' and such court exceeds its duty when it becomes an advocate and asks improper questions." *Id.* at 385 (quoting *Pariser v. City of New York*, 146 F.2d 431, 433 (2d Cir.1945)).

The Court did indeed ask questions of these two witnesses regarding their observations of criminal activity in the Cypress Hills project in order to clarify their testimony. During its charge, however, the Court carefully advised the jury that it did not intend to suggest that it had an opinion regarding the merits of the case:

I ... ask you to draw no inference from the fact that upon occasion I asked questions of the witnesses. As I told you before, when I did that those questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinion on my part as to the verdict you should render or whether any witness may have been more credible than any other witness. You are expressly to understand that the Court has no opinion as to the verdict you should render in this case.

I want to reemphasize that, because in the real world, once a judge asks a witness a question, jurors may think that the judge has some opinion about the case, or the judge ... favors one side or the other, because he's asking questions of a particular witness at a particular time, maybe the questions of one witness [are] a little more extensive than questions of another.... My only reason in doing that was to perhaps have things explained more clearly, to avoid any ambiguity, and any confusion, to have things clarified, to move the trial along. But you may have some perception that maybe the way I phrased a question, or when I interrupted, was sort of tipping my hand that I really feel this way or that way toward one of the parties in this case, or one of the lawyers. That was not the intention whatsoever. If you harbor such a thought, wipe it out of your mind.

Tr. at 785–86.

The Court endeavored at all times to be even-handed in this case which, as noted above, was highly emotional. For instance, the Court permitted the Housing Authority to call Matthews to the stand, despite the fact that he was not on the Housing Authority's witness list, in order to give testimony regarding Operation Lockout. The Court, on occasion and with a view toward moving the trial along, asked questions of certain witnesses. However, the Court was also careful to instruct the jury that it should not infer that the Court favored one side over another because of the nature and amount of questions asked. On this record, the Court can-

not conclude that its occasional posing of questions to witnesses deprived the Housing Authority of a fair trial. Its motion for a new trial on this basis is therefore denied.

### E. "Newly Discovered Evidence"

The Housing Authority also seeks a new trial based upon a series of letters that Henriques sent to Housing Authority attorneys after trial. In these letters, Henriques maintains, *inter alia,* that he and Ortiz engaged in a consensual sexual relationship and that she falsely reported that he had raped her because he had refused to give her $300. He also writes that Frank had sent two investigators to see Henriques in prison and that the investigators told Henriques that if he gave testimony favorable to Ortiz, they would pay him and ensure that his time in prison was reduced. Moreover, Henriques has signed an affidavit attesting to this new story, which affidavit is included among the Housing Authority's submissions. The Housing Authority has also included a statement from Henriques' sister, Sonia, that corroborates certain of his allegations against Frank. On June 4, 1998, the Court denied the Housing Authority's application for additional discovery regarding Henriques' allegations and for a stay of all post-trial motions.

"Motions for a new trial based on newly discovered evidence are disfavored." *Waul v. Coughlin,* 177 F.R.D. 173, 176 (S.D.N.Y. 1997). Before a new trial may be granted based upon newly discovered evidence, the movant must demonstrate that:

> the alleged newly discovered evidence was discovered since the trial; facts from which the court may infer reasonable diligence on the part of the moving party; that the evidence is not merely cumulative or impeaching; that the evidence is material; and that the evidence is of such a character that on a new trial it will probably produce a different result.

*Ope Shipping, Ltd. v. Underwriters at Lloyds,* 100 F.R.D. 428, 432 (S.D.N.Y.1983) (quoting *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 410 (10th Cir.1965)). "Courts are particularly reluctant to grant such motions where the newly discovered evidence consists of a witness recantation as such recantations are 'looked upon with the utmost suspicion.'" *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987) (quoting *United States ex rel. Sostre v. Festa,* 513 F.2d 1313, 1318 (2d Cir.1975)); *see also Dobbert v. Wainwright,* 468 U.S. 1231, 1233–34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) ("Recantation testimony is properly viewed with great suspicion.... [A] witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will render probable a different verdict.") (Brennan, J., dissenting) (internal quotations omitted); *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995) ("Courts characteristically treat witness recantations 'with the utmost suspicion.'") (quoting *DiPaolo, supra* ); *Fisher v. United States,* 6 F.Supp.2d 254, 261 (S.D.N.Y.1998) ("[T]he Second Circuit has cautioned that claims of witness recantation are to be viewed with 'utmost suspicion.'") (quoting *DiPaolo, supra* ). "When a motion for a new trial is predicated entirely on an affidavit from a trial witness who recants [his] testimony, a trial judge can ordinarily deny it without a hearing. The need for a hearing is diminished when ... the judge observed the demeanor and weighed the credibility of the witness at trial." *DiPaolo,* 835 F.2d at 51 (citations omitted).

The Court has carefully considered Henriques' affidavit submitted in support of this motion, as well as the letters in which he recants his trial testimony and contends that his relationship with Ortiz was consensual. The Court has also reviewed the statement of Sonia Henriques. In addition, the Court had ample opportunity to observe Henriques' demeanor during trial. Henriques' trial testimony was equivocal, self-serving and inconsistent. Henriques changed his story several times over the course of this action, and the jury was fully advised of these often significant changes. He testified at trial that he had entered the building to visit his friend Keith, although he testified at his deposition that he had entered the building to visit his friend Shawn. He denied at trial having followed Ortiz into the building, although he admitted to Frank's investigator that he had

followed her into the building and that he knew the lock was broken. Although Henriques admitted at trial to having raped Ortiz, he denied having robbed her. However, Henriques indicated at his deposition that he had taken jewelry and money from Ortiz. In excerpts from his deposition that were read to the jury, Henriques first denied, then admitted to having raped Ortiz, and on redirect examination, Henriques admitted that in 1994 he had given a statement in which he denied having committed the rape. Finally, the jury was read Henriques' letters in which he threatened to change his story unless Frank paid him $30. As noted above, Henriques stated that he had no recollection of having been offered any money in return for his testimony, and that, in fact, he was not paid for his testimony.

In light of Henriques' proven history of offering inconsistent versions of the incident, the Court simply cannot conclude either that his current story is true or that his latest spin on the events of December 26, 1992 would have led to a different verdict. Accordingly, and in the exercise of its discretion, *see Ope Shipping*, 100 F.R.D. at 431–32, the Court determines that the Housing Authority is not entitled to a new trial based upon Henriques' recantation testimony.

### F. Excessiveness of the Verdict

■ Finally, the Housing Authority contends that the jury's verdict of $3 million in compensatory damages—$2 million for past pain and suffering and $1 million for future pain and suffering—was excessive. In diversity cases arising under New York law, a federal district court determines whether a damage award is excessive by looking to whether the award " 'deviates materially from what would be reasonable compensation.' " *Gasperini v. Center For Humanities, Inc.*, ("*Gasperini I*"), 518 U.S. 415, 422, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (quoting C.P.L.R. § 5501(c)); *see also Gasperini v. Center For Humanities, Inc.*, 149 F.3d 137, 140–42 (2d Cir.1998). The "deviates materially" standard "calls for closer surveillance than the 'shocks the conscience' " standard applicable to other federal cases, *see Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.

1990) (explaining "shock the conscience" standard), and, *inter alia*, requires the Court to look to awards approved in similar cases. *Gasperini I*, 518 U.S. at 423–25, 116 S.Ct. 2211.

The jury heard testimony from Ortiz and two treating mental health professionals regarding her emotional condition in the aftermath of her humiliating gunpoint rape: It should be noted that Ortiz first began to testify on April 21, 1998, but that she collapsed once questioned about the rape and was unable to continue with her testimony on that day. Venerenda Regencia, the occupational health nurse coordinator employed by the federal government to work in the courthouse for the Eastern District of New York, testified thereafter that Ortiz's blood pressure immediately after her collapse was elevated and that her pulse was very rapid.

Ortiz returned on April 23, 1998 to complete her testimony. She stated that she experienced tremendous fearfulness ever since the rape and that this fearfulness has persisted. She can no longer watch television that depicts any violence. She works seven days a week to avoid being home alone. When in her apartment by herself, she moves furniture in front of the door and keeps a knife close by, and at night she checks the closets and the bathtub for intruders. She testified that she is unable to leave the house and go from place to place by herself. She must be accompanied by her grandchild, her daughter, or her former companion. She lost all interest in sexual relations following the attack, resulting in the termination of a 14-year romantic relationship.

Dr. Samuel Lustgarten ("Lustgarten"), a psychiatrist who has treated Ortiz since 1994, testified that he has diagnosed Ortiz with chronic post-traumatic stress disorder, which condition has not abated in the four years he has been treating her. This condition has manifested itself in persistent sleep disturbances, including nightmares about the attack, decreased appetite, depression, memory loss and anxiety. Ortiz had been taking Benedryl to help her sleep for a period of two years before she finally sought psychiatric intervention. Lustgarten described Ortiz as "a lady who responded to every catalyst."

Tr. at 281. Thus, he testified that Ortiz "avoided going to her mother's house," because it resembled the building where she was attacked, and that she avoided "anything that appears ... [to present] a remote possibility of rape": "She avoided going into the street if she could. She went back and forth locking the door ... or checking the door to make sure that it was locked, to make sure it wouldn't happen again." *Id.* Ortiz has been treated with Xanax, an anti-anxiety drug, Deseryl, an anti-depressant used to help her sleep, Prozac, an anti-depressant drug, and Buspar, an anti-anxiety drug with anti-depressant properties. However, Lustgarten testified that Ortiz has not responded well either to these drugs or to psychotherapy, and was still suffering from depression and extreme anxiety. Indeed, he stated that he had seen no material changes in the many years he has treated her, that he did not anticipate any immediate changes, and that it was conceivable that her condition could continue for the rest of her life.

Lustgarten also testified that Ortiz could not have faked her elevated blood pressure and pulse on the first day of her testimony: "You don't fake high blood pressure. You don't fake sudden physiological changes. These are recordable events." Tr. at 286. He also testified that her symptoms at that time were consistent with his diagnosis of post traumatic stress disorder. He stated, in fact, that she suffers from such symptoms "all the time":

> She gets clammy, her heart starts running a little bit faster, that's what tachycardia is, and those are the things—when anything related to that particular situation triggers that type of an event with the patient—when she's on the street similar things happen because she's very fearful of this event and she can't shake it no matter what we do.

Tr. at 285–86.

Also testifying at trial was Ortiz's therapist Ramon Roman ("Roman"), a certified social worker, Roman testified that he had first met with Ortiz in late 1994. She complained of depression and anxiety, indicating that "she was afraid to get into the elevators, afraid to walk in her neighborhood and she was having flashbacks...." Tr at 223. Roman noted that her condition had been "up and down, actually .... She feels well, feels better for awhile. She feels her medication is helpful, but then almost any stressful situation, watching television, walking around—she's not able to walk around in her neighborhood—any stressful situation would set it off." Tr. at 228. Roman also indicated his opinion that the rape had caused Ortiz to be less able to deal with other traumatic life experiences. Roman observed that Ortiz works almost constantly in order to keep her mind occupied, sometimes seven days a week. He concurred in Lustgarten's diagnosis of post-traumatic stress disorder, opining that her condition was chronic and that it "will continue for a long time." Tr. at 233.

There was thus evidence before the jury that the rape had dramatically changed the quality of Ortiz's life. Following the attack, she suffered from persistent anxiety, depression and sleeplessness, which conditions continued to the time of trial. She is unable to leave her apartment by herself; indeed, the prospect of staying in her apartment alone often compels her to work seven days a week. When at home, Ortiz barricades herself into her apartment, with a knife ready in the event that an intruder is able somehow to make his way through the furniture she places against the door. She has lost all interest in social activity, including sexual activity, and as a result, her romantic relationship of approximately 14 years ended. Moreover, both her therapist and her psychiatrist testified that she had shown no sustained improvement as of the time of trial, and that the potential for improvement was unlikely in the near future and uncertain over the long term.

Under these circumstances, the Court concludes that the jury's compensatory damage award does not materially deviate from reasonable compensation. The Court has reviewed compensatory damage awards in similar cases. *See Kukla v. Syfus Leasing Corp.,* 928 F.Supp. 1328 (S.D.N.Y.1996) (upholding award of $1.35 million for rape that occurred in hotel); *Splawn v. Lextaj Corp.,* 197 A.D.2d 479, 603 N.Y.S.2d 41 (1st Dep't 1993) (upholding award of $2 million for rape

in hotel); *Schneider v. National R.R. Passenger Corp.,* 987 F.2d 132 (2d Cir.1993) (upholding award of $1.75 million for a woman who was robbed and subjected to attempted rape); *Pantages v. L.G. Airport Hotel Assocs.,* 187 A.D.2d 273, 589 N.Y.S.2d 426 (1st Dep't 1992) (upholding award of $1.875 million for rape and sodomy in hotel); *Knor v. Parking Co. of America,* 73 Ohio App.3d 177, 596 N.E.2d 1059 (Ohio App.1991) (upholding $2 million verdict for victim of kidnaping and sexual assault); *Carole A. v. City of New York,* 169 A.D.2d 800, 565 N.Y.S.2d 169 (2d Dep't 1991) (upholding verdict of $1,075,000 in case involving rape of school psychologist); *Haddock v. City of New York,* 140 A.D.2d 91, 532 N.Y.S.2d 379 (1st Dep't 1988), *aff'd* 75 N.Y.2d 478, 553 N.E.2d 987, 554 N.Y.S.2d 439 (1990) (upholding verdict of $2.5 million in case involving rape of child in New York City playground). Although this award is admittedly somewhat higher than these other awards, the Court concludes that it is justified based upon Ortiz's testimony and the testimony of her treating mental health care givers, who gave forceful accounts of the nature of her emotional condition and were guarded about the potential for improvement in the future.

## III. MOTION FOR A STAY WITH WAIVER OF SUPERSEDEAS BOND

The Housing Authority also seeks a stay of execution pending appeal without the necessity of filing a supersedeas bond. Although the posting of a bond is ordinarily required by Rule 62(d) of the Federal Rule of Civil Procedure, district courts have discretion to waive this requirement. *See Federal Deposit Ins. Corp. v. A & R Constr., Inc.,* 921 F.Supp. 153, 154 (E.D.N.Y.1996) (citing 7 James William Moore, Moore's Federal Practice ¶ 62.06 (2d ed.1995)); *see also Exxon Corp. v. Esso Worker's Union, Inc.,* 963 F.Supp. 58, 60 (D.Mass.1997). Counsel for Ortiz does not oppose the request. Moreover, the Housing Authority, as a government subdivision, has ample means to satisfy Ortiz's judgment. Accordingly, the Housing Authority's motion for a stay of execution with waiver of supersedeas bond is granted.

## CONCLUSION

For the foregoing reasons, the Housing Authority's motions for judgment as a matter of law and for a new trial are denied. The Housing Authority's motion for a stay of execution with waiver of supersedeas bond is granted.

**SO ORDERED.**